WILLIAM H. SHAPTER ET AL., Appellants, v. WILLIAM O. BOYD.— 37 S. W. (2d) 542.

Division One, March 31, 1931.

398

*L. W. Booher, Duvall & Boyd* and *Miles Elliott* for appellant.

*Bart M. Lockwood* for respondent.

SEDDON, C.—This is an action under the statute (Sec. 525, R. S. 1919) to contest the validity of the will of Belle Boyd, a spinster, who died a resident of Buchanan County, Missouri, on October 18, 1926, at the age of seventy years. The will in controversy was admitted to probate in the Probate Court of Buchanan County on October 20, 1926, and the instant statutory action was commenced in the Circuit Court of Buchanan County on December 9, 1926. The validity of the will is contested upon the grounds of the alleged testamentary incapacity of testatrix, and undue influence, alleged to have been exercised over the mind of testatrix by the sole beneficiary under the will, who is the defendant, William O. Boyd. The will was executed and published by testatrix on September 18, 1920, some six years prior to the date of her death. The testatrix, in and by the said will, after directing the payment of all her just debts, funeral expenses, and the expense of the erection of a suitable monument over the grave of testatrix, gave, devised and bequeathed to her brother, William O. Boyd, all of her property, both real and personal, of every kind and character, and wherever situate, with the provision that, in case of his prior decease, his heirs shall succeed to his interest in testatrix's estate. The will nominated said William O. Boyd as the executor thereof, and he was duly appointed executor by order of the Probate Court of Buchanan County.

The contesting plaintiffs, William H. Shapter and Lenver Shapter, are the nephews of testatrix, being the sons of a predeceased sister of testatrix. The other contesting plaintiffs, William Lamar, Orville Lamar and Ferris C. Lamar, respectively, are the widower, and the

two sons, of Sarah Lamar, a deceased sister of testatrix, who survived testatrix, but who died after the commencement, and before the trial, of the instant action. The three persons last named were substituted as parties plaintiff in the place and stead of Sarah Lamar, deceased, who was an original party plaintiff.

The petition is in conventional form, and by proper averments presents the issues of testamentary capacity, and of undue influence. The answer of the defendant is a general and specific denial of the petition. A reply was filed by plaintiffs, denying generally the averments of the answer.

The action was tried to a jury, and the trial court submitted to the jury the issues of the testmentary incapacity of testratrix, and of undue influence upon the part of defendant. Nine of the jurors returned a verdict, sustaining the validity of the will, and the trial court entered a judgment in accordance with the verdict. After an unavailing motion for new trial, plaintiffs were allowed an appeal to this court.

The testatrix's property and estate consists of 51 acres of farm land in Buchanan County, certain household furniture and effects, cash on deposit in three banks, several promissory notes, and certain bonds of the Nishnabotna Drainage District, the Pickering Lumber Company, and the Argentine National Exchange. The appraised value of testatrix's estate is approximately $27,000.

The record herein is voluminous, and includes the substance of the testimony of more than fifty witnesses. The great volume of testimony prevents our stating in this opinion more than a condensed summary of the substance, scope and trend of the evidence.

The evidence shows that the father of testatrix, Jarrett Boyd, was a pioneer settler of Buchanan County, and during his lifetime acquired considerable farm lands in the south part of said county, upon which he built a rather imposing residence. Jarrett Boyd died intestate in the year 1897, at the age of 84 years, leaving an estate consisting of about $60,000 in live stock and other personal property, and 200 acres of farm land. His wife predeceased him several years. He was survived by two sons, Ben Boyd, and William O. Boyd, the defendant herein; by three daughters, Sarah Lamar, Jane Boyd, and Belle Boyd, the testatrix; and by two grandsons, William H. Shapter and Lenver Shapter, two of the contesting plaintiffs herein, who are the sons of Ann Shapter, a predeceased daughter of Jarrett Boyd. The property and estate of Jarrett Boyd was partitioned and distributed among the aforementioned heirs and lineal descendants of Jarrett Boyd.

The mother of William and Lenver Shapter died when the latter were young children, and they were taken into the home of their grandfather, Jarrett Boyd, where they were reared until they reached manhood, when both William and Lenver Shapter were married, and

removed to homes which they established for themselves, long prior to the death of their grandfather. Jarrett Boyd. Likewise, the daughter Sarah married William Lamar in the year 1885, and some time later removed with her husband to a farm in Andrew County, where she resided until her death, which occurred after the commencement of the instant suit. Her two sons, Orville Lamar and Ferris C. Lamar, and her surviving husband, William Lamar, were substituted in her place as parties plaintiff in the instant suit.

After the death of Jarrett Boyd, his four unmarried children, Jane, Ben, Belle, and William O. Boyd, continued to reside in the family domicile. Jane and Belle attended to the housekeeping, and Ben and William farmed the land. Several years after the death of his father, William O. Boyd married and removed with his wife to a portion of the land he had received from his father's estate, where he built a home for himself, and where he still resided at the time of the commencement of this action. His unmarried sisters, Jane and Belle, and his unmarried brother, Ben, continued to reside in the old family domicile. Ben Boyd died intestate in the year 1911. An attempt was made by William Boyd to agree with the other collateral heirs of Ben Boyd upon an amicable distribution of Ben's estate, failing in which attempted agreement, William O. Boyd brought a suit to partition Ben's estate, and the lands and personalty of Ben Boyd were divided among his collateral heirs. In the same year, and shortly after Ben's death, William H. Shapter filed an information in the Probate Court of Buchanan County charging that his aunt, Jane Boyd, was a person of unsound mind and was incapable of managing her affairs, resulting in an inquiry as to the soundness of mind of Jane Boyd before a jury, who returned a verdict and finding that Jane Boyd was a person of unsound mind and incapable of managing her affairs, and the Probate Court of Buchanan County entered a judgment in accordance with the verdict of the jury, and entered an order appointing William O. Boyd as guardian of the person and estate of Jane Boyd. It appears from the evidence that Belle Boyd, the testatrix, resented and disapproved of the action of William H. Shapter in instituting the inquiry as to the sanity of her sister, Jane. In the year 1917, Jane Boyd died intestate, while under guardianship, and William O. Boyd thereupon filed in the Probate Court his final settlement of the guardianship of Jane's estate, in which he prayed for certain allowances for his services as the guardian of Jane's estate, and also prayed for certain allowances to Belle Boyd for her services in the care and nursing of her sister, Jane. The sister, Sarah Lamar, employed attorneys to oppose the approval of the final settlement of the guardianship of Jane's estate, and to resist the allowances prayed by William O. Boyd and Belle Boyd. At the hearing in the probate court, William H. Shapter and Lenver Shapter appeared as wit-

nesses against the allowances claimed by William O. Boyd and his sister, Belle Boyd. The action of Sarah Lamar and the Shapter brothers in opposing the allowances claimed by Belle and William O. Boyd resulted in resentment and ill-feeling upon the part of Belle Boyd toward her sister, Sarah Lamar, and her nephews, the Shapter brothers. There is testimony that Belle Boyd, the testatrix, had stated, on several occasions following the hearing upon the settlement of the guardianship of Jane Boyd's estate, that she intended to make a will and "fix her affairs" so that her sister, Sarah Lamar, and her nephews, William and Lenver Shapter, would receive nothing from her. Immediately after Jane Boyd's death, William H. Shapter brought a suit to partition Jane's land and estate. There is evidence that Sarah Lamar and the Shapter brothers never visited Belle Boyd after the death of her sister, Jane, although the Shapter brothers resided not far distant, and Sarah Lamar resided in a nearby county. Lenver Shapter testified that the reason he had not visited his aunt, Belle Boyd, was that his uncle, William O. Boyd, had stated to him, on an occasion shortly after Ben Boyd's death, and prior to the death of Jane Boyd, that "he (William O. Boyd) had told Aunt Sally (Sarah) Lamar that he didn't want her there, and he said, 'I made Belle tell her she didn't want her there; and I'll go further than that, I don't want you and Henry (William H. Shapter) there; I have to look after those two women (meaning Jane and Belle Boyd) and I'm not going to have you fellows fooling around there.' " Lenver Shapter said he communicated the alleged statement of William O. Boyd to his brother, William H. Shapter. The defendant positively denied having made any such statement.

William H. Shapter testified that his uncle, William O. Boyd, had told him, just prior to the settlement and distribution of the estate of Jarrett Boyd, that "if they (meaning Sarah Lamar and Lenver Shapter) kept monkeying around, and doing nothing, he (William O. Boyd) would have Uncle Ben and Aunt Jane and Aunt Belle make their stuff over to him (William O. Boyd); if Lenver and Aunt Sally didn't be careful of themselves and quit acting contrary, he was going to have them (meaning Ben, Jane and Belle) make it over to him—make a will, I believe—turn the property over." The defendant emphatically denied having made any such statement to William Shapter.

The will of Belle Boyd was written at testatrix's direction by Bart M. Lockwood, an attorney whose office was located in the Corby-Forsee building in the city of St. Joseph, on the morning of September 18, 1920. Mr. Lockwood testified that he had known the testatrix for some ten or fifteen years prior to the preparation of her will, and had previously represented testatrix as her attorney in two or three matters. He testified that he had also represented

the defendant, William O. Boyd, in several matters. Respecting the preparation of testatrix's will, Mr. Lockwood testified: "She (testatrix) came to the office, and my recollection is I took her into my private office; she said she wanted to consult me. We went in there and she disclosed her business to me, that she wanted me to prepare her will for her. Then for some little time I discussed how the will was to be drawn, and talked with her for probably half an hour, making a memorandum of the matters she wanted incorporated in the will and how she wanted her property disposed of; then I wrote the will on the typewriter myself. She said how she wanted to dispose of her property. I asked her what disposition she wanted to make of it. She said she wanted to give it all to Bill— that is William O. Boyd, the defendant here. She asked me if she had to mention the Shapters and Mrs. (Sarah) Lamar in the will— if it would be a good or legal will—if it would be good if she didn't mention them. I advised her it would be good; that she did not have to mention them because they were not her children. Then she said if she didn't have to mention them she didn't want to say anything about them in the will. She said she didn't want to give them any property. I asked her how she felt toward them, and she told me that they were unfriendly toward her; that they had not visited her in a number of years, and she frankly said, as far as that was concerned, that she didn't want them to come to visit her. She said that Henry (William H.) Shapter had started a proceeding against her sister, Jane, and had put them into litigation over Ben's estate, and they were unfriendly, and she didn't want them to have any of her property, and that was why she was making the will. She said that her sister, Sarah Lamar, had lied about her on the witness stand at the hearing in the probate court. In the hearing in the probate court in the Jane Boyd estate matter, I represented Belle Boyd and William O. Boyd, because objections had been filed to the allowance of both of their claims. . . . She remarked at that time, following the hearing in the probate court over Jane's estate—Belle was rather angry at what had been said by Mrs. Lamar and the Shapters on the witness stand—and she remarked at that time that she hoped they wouldn't get any of her property, or something to that effect. . . . As to whether or not she had very decided views about the way she wanted to dispose of her property when she came in that day, she had very clearly in mind, and described to me very clearly, what she wanted to do. She told me she wanted to make this will because she wanted Bill (defendant) to have it, or if he died before she did she wanted his children to have it, and didn't want the Shapters and Mrs. Lamar to have any of it; and she made it just as strong as she could to me, and she described what property she had, and told what property they had received from the estate, and gave me her reasons why

she didn't want them to have any of it. From my acquaintance with her and my knowledge of her, I would say that, at the time of the execution of this will, she was of sound mind; a normal, healthy woman.''

The will of Belle Boyd was witnessed by Bart M. Lockwood, Mrs. Flora Hudson, and Ernest R. James, an attorney and a former state senator, who was an office associate of Mr. Lockwood. The testimony of the three subscribing witnesses to the will made a prima-facie case for the proponent of the will upon the issue of testatrix's testamentary capacity, all of the subscribing witnesses testifying that testatrix was more than twenty-one years of age and of sound mind at the time she signed and published her will, and that testatrix personally requested each of them to subscribe their names as witnesses to the will, which was done in testatrix's presence and in the presence of each other.

One of the subscribing witnesses to the will, Mrs. Flora Hudson, had known testatrix for many years, and had long been an intimate friend and neighbor of testatrix, residing upon a farm a short distance from testatrix's home. Mrs. Hudson testified that, on the morning the will was executed, the testatrix requested her to accompany testatrix to St. Joseph for the purpose of witnessing testatrix's will; that "Belle (testatrix) said she wanted me to go with her—she wanted to make her property over to her brother, and she wanted me to go along;" that they came to St. Joseph with defendant, his wife, and his son, in defendant's automobile; that, upon arriving in St. Joseph, the defendant, his wife, and his son, left testatrix and the witness "downstairs in the Corby-Forsee building;" that testatrix and the witness went alone, in the elevator, to Mr. Lockwood's office, which was situated upon an upper floor of the building; that while they were at Mr. Lockwood's office, the defendant and his family "were out in town;" and that, after the preparation and execution of the will, they all met later in the morning at a parking station, from whence they returned to their several homes in defendant's automobile. The testimony of defendant is to the same effect, except that defendant testified that testatrix and Mrs. Hudson left defendant, his wife, and his son, at the parking station, and that defendant, his wife, and his son, did not accompany testatrix and Mrs. Hudson to the office building in which Mr. Lockwood had his office.

The defendant testified that, several months before the execution of the will, he had asked Mr. Lockwood if he would write his sister's will: "I told Mr. Lockwood, several months before, that Belle said she wanted to write a will—that is why I came to ask him if he would write one; I told him she wanted one; I think I went and asked him if he would write one for her; I don't just remember what the conversation was exactly."

After the proponent of the will had made a prima-facie case upon the testimony of the three subscribing witnesses to the will, the contestants proffered seventeen lay witnesses, including the plaintiffs, William H. and Lenver Shapter, and William and Orville Lamar. The substance of their testimony was to the effect that the testatrix, Belle Boyd, had attended the district or country school when a child; that she received no further education; that she was not as apt a pupil as other children of her age; that her mind "was not very sound," and "was below the average mind;" that she was "not very bright;" that she was a "weak-minded person;" that she "was considered rather feeble-minded;" that she had "what I would call an undeveloped mind;" that she had "the mind of a child;" that she led a quiet life; that she did not "visit about very much;" that she "stayed at home pretty close;" that she took no interest in politics, and never voted at elections; that she did not seem to be interested in current events or happenings; and that she "couldn't figure or count money, or do anything of that kind, to do any good." Much of such testimony came from mere casual acquaintances of testatrix, who had not seen or talked with testatrix for thirty-five or forty years prior to the execution of the will. The contestant, William H. Shapter, testified: "Belle Boyd had the mind of a child ten or twelve years old. She was about as intelligent of mind and no stronger of mind than Jane was. I thought Jane Boyd was weak-minded and feeble and had a child's mind, and that is part of the reason I had a guardian placed over her, and the other reason was to keep her from making a will. I didn't put a guardian over Belle, at that time, for aunt Jane was 'sick, and Belle was stout and hearty. She was strong in health, and looked after her own household duties. She was a fair to good housekeeper; about the average. She done very well. She kept her house moderately clean and neat all the time. She did not waste any of her money that I know of. . . . The acts Belle Boyd did which indicated that she had the mind of a child were that she would not get interested in the general affairs of the public, like a presidential election or anything that way. It was no more to her than anything else, what was unusual with most women. . . . Her whole actions were more of an undeveloped-minded person. An older person, it seemed like, would act more like grown up people. She was not interested in politics, and not interested in how the school was run. She stayed at home; never visited around among the neighbors much. *No, I don't claim that she was insane.* The fact that she was not interested in the school, did not indicate that she was of unsound mind. *I don't think she was of unsound mind;* no, sir; just an undeveloped mind, the mind of a child." Contestant, Lenver Shapter, testified: "I would put it that Belle Boyd had the mind of a child. She was always a pretty strong woman; well built, very large and strong, and

appeared during most of her life to be very healthy, and did a great deal of work around the place, and was most always busy, and took care of her house; did her own chores; milked a cow; and raised chickens. Her and Aunt Jane went ahead and done their housework. Yes, they knew what to do and went ahead and did it. As to whether I ever noticed Belle doing anything foolish or childish in her life, I don't know what you would call foolish, but I never noticed." One of contestants' witnesses testified: "At times Belle Boyd showed she wanted her own way. She could be very positive. If she wanted to have her own way there didn't seem to be anybody who could stop her. She was strong-minded about some things."

The contestants offered some testimony to the effect that, a day or two prior to the death of Jarrett Boyd, the father of testatrix, he called the defendant, William O. Boyd, to the bedside and said to his son: "Will, I have got to go; you will have to look after Ben, Jane and Belle, for they can't look after themselves." One of contestants' witnesses testified: "On the day Belle Boyd (testatrix) was buried, or about that time, the defendant, William O. Boyd, stated to me that his father, about the time the father died, had asked or directed him to look after Ben and Jane and Belle, and not let anybody get what they had, or words to that effect. He (defendant) said he had tried to do what the old man had asked him to do, to see after Ben, Jane and Belle, that nobody didn't beat them out of what they had; said they had plenty if they would take care of it."

Defendant testified as follows, respecting the father's direction: "I was at my father's bedside during his last illness all the time, unless I was in the field at work. As to whether my father called me to his bedside and suggested, 'I will have to go; you will have to look out for Jane, Ben and Belle; they can't care for themselves,' he did not say that. He called us in a time or two; he said, 'You four (meaning Jane, Ben, Belle, and William Boyd) stay here on the old farm, keep what I leave you, and you will always have a living for each other.' That is what he said."

In rebuttal, the proponent proffered thirty-five lay witnesses, many of whom had been intimately acquainted with testatrix during the most of her lifetime. The substance of their testimony was that testatrix had always been a strong and healthy woman; that she had an average and normal mind and mentality; that she was neither childish in mentality, nor was she easily influenced; that she managed and attended to her own household and business affairs; that she was "possessed of good common sense;" that she had "just about as good a mind as anybody;" that she usually "had her own way about matters;" that she "always seemed to have a good mind, and one of her own;" that she "was not an easy woman to be per-

suaded into anything;'' that ''there was nothing foolish, childish, or feeble-minded about her talk and conversation;'' that she ''was rather strong-minded;'' that ''she was a quiet woman, interested in her own business;'' that, although ''she had not had much education, as far as common sense was concerned, she had as much as anybody;'' that ''she was very positive in her manner and ways, and was not easily influenced; if she made up her mind to do a thing, she did it;'' that ''she attended strictly to her own business;'' that she attended to her household duties, and the cultivation of a garden; that she raised chickens and kept a cow, and sold the eggs, chickens, butter, and other small produce from her farm; that she frequently drove a horse and buggy from her farm to the neighboring town of Dearborn, and to the city of St. Joseph; that she visited often with intimate friends and neighbors and showed an interest in the affairs of her community; that she ''seemed to like all the other women of her neighborhood;'' that her memory was good, and she often related incidents that occurred in her youth, and ''had no difficulty about remembering things that had happened years before;'' that she had told some of her intimate friends and neighbors that she intended to make a will and leave all of her property to her brother, William Boyd; and that ''she said that her brother had been good to her, and that she intended to give him her property at her death.''

We have searched the record herein in vain for any substantial evidence, direct or circumstantial, that defendant exerted any undue influence over the mind of the testatrix, either at, or before, the time of the execution of the will. Such being the status of the record, the contestants of the will are forced to the position of relying upon a presumption of undue influence, which presumption, contestants assert, arises out of what they claim to be substantial evidence of a confidential and fiduciary relation existing between testatrix and defendant prior to, and at the time of, the making and execution of the will, and which confidential and fiduciary relation, the contestants contend, is established by the testimony and admissions of defendant. With respect to such matter, the evidence shows that, after the death of Jane Boyd in 1917, the testatrix lived alone in the old family domicile until her death. The defendant had resided upon his own farm, with his wife and family, long prior to the death of his sister Jane, and at no time after the marriage of defendant and his removal to a home of his own, had he resided in the same home, or under the same roof, with the testatrix. Until some eight or ten years before her death, the testatrix had owned a horse and buggy, and, with such means of transportation, unaided by defendant, she attended to her own marketing, drove to neighboring towns and purchased such groceries and other household provisions as she required, and brought the eggs, chickens, butter,

and such other articles of garden produce as she raised upon her home place into town, where she either sold them for cash to local storekeepers, or bartered them for groceries and household provisions. The last eight or ten years of her life, however, testatrix was without any means of transportation, the driving horse she had owned having died, as a consequence of which she had no horse, automobile, or other means of transportation by which to travel to town. She then sold the garden and poultry products that she raised to hucksters and peddlers, who called at her home. The greater part of her land was rented out by testatrix to crop tenants, the tenants and testatrix sharing the proceeds arising from the sale of such wheat, corn, and other farm products as was raised by tenants upon the testatrix's land. The marketing of such farm products was usually attended to by the testatrix's tenants, who would either bring to testatrix her share of the cash proceeds, or would purchase for testatrix, with her share of the proceeds, such provisions and groceries as testatrix would direct the tenants to buy for her. The testatrix had received a considerable amount of money as her share in the distribution of her deceased father's estate, which money she had deposited in her name, and to her personal account, in a bank at Dearborn. From time to time, as the bank deposit of testatrix increased in amount, one of the officers of said bank would inform testatrix (usually through the medium of her brother, William) of loans that she might make upon the security of farm mortgages, and whenever testatrix approved of making such a loan, she would write a check upon her bank account for the amount of the loan, and the officer of the bank would make the loan on her behalf, and would attend to the preparation and proper execution of the promissory notes evidencing such loan, and to the recording of the mortgage or other documents securing payment of the same, and to whatever other details were incident to the transaction. The notes and other papers connected with such loans usually were retained in the custody of the bank. The interest payments on such loans were ordinarily collected by and through the bank, and were deposited in testatrix's bank account, and the bank would mail to testatrix a postal card notice, advising her of the collection of such interest payments, and of the crediting of such payments to testatrix's bank account. Likewise, whenever the bank collected the principal of any such loan, the bank would credit the same to testatrix's bank account, and would mail a notice of the transaction to testatrix. Checks upon testatrix's bank account were ordinarily drawn and signed by testatrix, and some twenty-five of such checks, varying in amounts from $4 to $5,000, and covering a period of time from 1917 to and including the year 1925, and all bearing the testatrix's signature, were proffered in evidence on the trial. There was some testimony proffered by contestants that several of the checks

upon testatrix's bank account were signed, "Belle Boyd, by William O. Boyd." The number and amounts of such checks are not shown by the evidence, and the defendant testified that he could remember of signing only two of such checks, both for small amounts, and issued in payment of taxes, which testatrix had authorized and requested defendant to pay on her behalf. Defendant testified that testatrix usually had consulted him with respect to loans made by her out of moneys in her bank account, but that testatrix, herself, always determined whether or not she would make the loans, and passed upon the security thereof. At the time of her death, testatrix had a savings account in the Tootle-Lacy National Bank of St. Joseph, amounting to $1500, and another savings account, amounting to $4700, in the American National Bank of St. Joseph. Whether such savings accounts were opened before, or after, the making of testatrix's will is not clearly disclosed by the evidence. The defendant testified that he had never had any personal account with either of the St. Joseph banks, and had never done any business with either bank. He testified that testatrix had probably consulted with him as to the selection of the St. Joseph banks, as the depositories of her accumulated savings, but that testatrix, herself, drew the checks upon her current checking account in the Dearborn bank, which checks were taken to St. Joseph by defendant and deposited in the respective savings accounts which testatrix maintained in the St. Joseph banks. At various times, the testatrix had purchased some United States, Canadian and Belgian government bonds out of her accumulated savings. Defendant testified that testatrix had consulted with him respecting such bond investments, and he, in turn, had consulted with bankers and bond brokers in St. Joseph respecting such investments, and had communicated their advice to testatrix, who used her own judgment in the selection and making of such investments. The interest accruing on such bonds, and the principal of the bonds, upon maturity, was usually collected by and through the banks, and was credited by the banks to testatrix's personal bank account. At the time of her death, testatrix owned one $1,000 bond of the Nishnabotna Drainage District, one $1,000 bond of the Pickering Lumber Company, and two $1,000 bonds of the Argentine National Exchange, which bonds earned interest at the rate of six per cent per annum, payable semi-annually. According to defendant's testimony, the last mentioned bonds were selected by testatrix from a list of available securities which had been sent to testatrix by a bond broker in St. Joseph. Defendant testified that he had consulted with the bond broker, and also with a banker in St. Joseph, respecting the soundness and safety of such bond investments, and had communicated their advice to testatrix. The last mentioned bonds were deposited for safe-keeping in a safe deposit box in the Tootle-Lacy National Bank in St. Joseph. Defend-

ant testified that the safe-deposit box was used jointly by himself and testatrix, or, as he expressed it, "in partnership," but he did not remember in whose name or names the safe-deposit box had been rented from the bank. Contestants did not proffer any evidence, or records of the bank, showing in whose name or names the safe-deposit box was rented, or what persons had access to the box. The defendant testified that he had possession of the key to the safe-deposit box, and that testatrix did not have a key to the box. The defendant testified further that, during the last eight or ten years of testatrix's life, when testatrix had no driving horse or other means of transportation, and when she had no telephone in her home, he would call at testatrix's home two or three times a week to see how she was getting along, and to perform such chores as she requested or needed to be done; that, upon her request, he sometimes would take the eggs, poultry, butter, and other garden produce raised by testatrix, to town, and there market the same; and that oftentimes he would order or purchase for testatrix such groceries, coal, and other household provisions as testatrix requested him to order and purchase for her.

At the conclusion of all the evidence in the case, the defendant (proponent) requested the court to give three separate peremptory instructions, in the nature of demurrers to the evidence. One of those peremptory instructions was designed to tell the jury that "the evidence in this case shows that, at the time the paper writing introduced in evidence was executed, Belle Boyd (testatrix) was of sound mind;" another of said instructions was designed to tell the jury that "there is no evidence in the case that defendant exercised any undue influence over the mind of the deceased, Belle Boyd, before or at any time the paper writing introduced in evidence was executed;" and the third of said instructions was designed to tell the jury that "under the law and the evidence of the case, your verdict will be for the defendant, and that the paper writing introduced in evidence was the last will and testament of the deceased, Belle Boyd." All of said peremptory instructions were refused by the trial court, and the cause was submitted by the court to the jury for determination of the issues tendered and presented by the petition.

I. Appellants (contestants) contend that there is no substantial evidence that testatrix had sufficient mental capacity to make a will, and, therefore, that the trial court erred in not awarding contestants a new trial upon the ground of the insufficiency of the evidence to support the verdict and finding of the jury upon the issue of testatrix's testamentary capacity.

As respects the issue of testamentary capacity, it is well settled by the adjudications of this court that the burden rests upon the proponent of the will (the defendant herein), throughout the whole case, to show the mental, or testamentary, capacity of the maker of the will. [Goodfellow v. Shannon, 197 Mo. 271, 279; Major v. Kidd, 261 Mo. 607, 628; Rock v. Keller, 312 Mo. 458, 489; Berkemeier v. Reller, 317 Mo. 614; Smarr v. Smarr, 319 Mo. 1153, 1165.]

A scrutinous survey of the entire evidence in the case convinces us that the proponent of the will has amply sustained the burden of proof with respect to the issue of testatrix's testamentary capacity. The proponent made a prima-facie case upon that issue by the testimony of the three subscribing witnesses to the will. No medical or expert witness was proffered by contestants, or by proponent, to testify respecting the mental capacity of testatrix. The contestants undertook to overthrow the prima-facie case made by proponent by proffering the testimony of seventeen lay witnesses. The testimony of contestants' lay witnesses consisted mostly of mere expressions of opinion, unsupported by any proof or recital of the facts upon which such opinions were founded. On the other hand, the proponent, in addition to the testimony of the three subscribing witnesses to the will, proffered the testimony of some thirty-five lay witnesses, many of whom had been close and intimate friends and neighbors of testatrix, whose acquaintanceship with testatrix, and whose opportunities for observation of testatrix's mentality, had extended over a long period of years, both before and after the making of the will. They all testified that testatrix was a woman of sound mind; that her memory was good; that there was nothing childish about her conversation or demeanor; and that she was always a strong and healthy woman, up to the very time of her death. A considerable number of proponents' lay witnesses testified in detail to the conversations, acts and conduct of testatrix, in support of their opinions that testatrix was of sound mind, and that she was possessed of the mental capacity to make a will.

As was said by this court in the recent case of Kaechelen v. Barringer, 19 S. W. (2d) 1033, 1037: "The rule is well settled that, ordinarily, before a lay witness will be permitted to give his opinion that a person is of unsound mind, he must first detail the facts upon which he bases such opinion, but if he expresses an opinion that such person is of sound mind, he is not required to detail the facts upon which he founds his opinion. The reason for the rule is obvious. An opinion that a person is of unsound mind is based upon abnormal or unnatural acts and conduct of such person, while an opinion of soundness of mind is founded upon the absence of such acts and conduct."

The opinions expressed by contestants' lay witnesses, to the effect that testatrix had "the mind of a child," "an undeveloped mind,"

and that she was a "weak-minded person," and her mind was "below the average mind," being unaccompanied by substantial proof of the facts upon which such opinions were predicated, and being unsupported by substantial proof of abnormal acts and conduct of testatrix, were utterly lacking in persuasiveness, cogency, and weight. [Smarr v. Smarr, 319 Mo. 1. c. 1168.] The opinions expressed by proponent's lay witnesses, to the effect that testatrix was of sound mind and was possessed of testamentary capacity, on the other hand, constituted substantial evidence upon the issue of testatrix's mental or testamentary capacity, under the prevailing rule as stated in Kaechelen v. Barringer, supra.

Substantial evidence of testatrix's testamentary capacity having been adduced by the proponent, and such evidence being amply sufficient to sustain the burden of proof resting upon proponent, it follows that the verdict of the jury, upholding the validity of the will, is conclusive, on appeal, upon the issue of testatrix's testamentary capacity. [Moll v. Pollack, 319 Mo. 744, 758; Hahn v. Hammerstein, 272 Mo. 248, 256; Beyer v. Hermann, 173 Mo. 295, 303.]

II. It is further contended by appellants that the evidence adduced by the proponent (defendant) was insufficient to rebut the presumption of undue influence by defendant over the mind of testatrix, which presumption is claimed by appellants to arise from facts and circumstances in evidence which clearly show that a confidential and fiduciary relation existed between testatrix and defendant at the time of, and prior to, the execution of the will.

It is the well settled law of this State, in statutory will contests, that, ordinarily, and in the absence of any substantial evidence showing the existence of a confidential and fiduciary relation between the maker of the will and a principal beneficiary thereof, the burden of establishing undue influence rests upon the contestants of the will throughout the entire trial of the contest. [Smarr v. Smarr, 319 Mo. 1153, 1165; Mowry v. Norman, 204 Mo. 173, 189.] However, if the contestants of a will show a state of facts which is sufficient to establish the existence of a confidential and fiduciary relation between a testator and a principal beneficiary of the will, then the law indulges the presumption of undue influence upon the part of such principal beneficiary of the will, and it devolves upon such beneficiary to rebut the presumption by the adduction of testimony tending to show that no undue influence was exercised by the beneficiary over the mind of the testator, the credibility of which rebuttal testimony is exclusively for the jury, and not for the court. [Mowry v. Norman, 204 Mo. 1. c. 189, 191, and cases there cited.]

A careful and exhaustive study and analysis, on our part, of the record in the instant case discloses no substantial evidence, direct or circumstantial, tending to show undue influence upon the part of the defendant over the mind of the testatrix. Hence, the issue of undue influence was not properly submissible to the jury, unless it can be held as a matter of law that the contestants of the will are entitled to the benefit of a presumption of undue influence, arising out of a state of facts shown in evidence which sufficiently and substantially establishes the existence of a confidential and fiduciary relation between the testatrix and the defendant. The mere fact that the defendant, appreciating that his sister, the testatrix, lived alone upon her small farm, and that she had no one to assist her in the performance of the chores and household duties in and about her home place, was solicitous concerning his sister's welfare, and ministered to her needs, does not give rise to an inference of undue influence; nor do the safeguards and precautions of the law against the danger of undue influence foreclose a brother from rendering to a maiden and elderly sister such affectionate and helpful service and ministrations as the brother may find time and opportunity to render in her behalf. [Lindsay v. Shaner, 291 Mo. 297, 309; Maddox v. Maddox, 114 Mo. 35, 48.] And mere opportunity to influence, however ample, does not afford a basis for an inference of undue influence. [Bushman v. Barlow, 316 Mo. 916, 944; Lindsay v. Shaner, 291 Mo. 297, 310.] Nor do we look with suspicion upon the circumstance that defendant brought the testatrix, and one of the subscribing witnesses to her will, in defendant's automobile, to the building in St. Joseph in which was the office of the lawyer who drew the will. The evidence shows that testatrix at the time had no horse, automobile, or other means of conveyance, and it was not an unnatural or suspicious circumstance that she should have requested her brother to convey her in his automobile to St. Joseph, and to the office of the lawyer who prepared her will, or that the defendant undertook to take her to St. Joseph. It has been held by this court that there is no impropriety in one brother discussing with another brother the provisions of the latter brother's will, and in making memoranda to be used by the scrivener in the preparation of the will, although the one brother was a principal beneficiary of the other brother's will. [Lindsay v. Shaner, 291 Mo. l. c. 309.] And we see no impropriety, or suspicious circumstance, in the act of the defendant herein, in conveying testatrix from her home in the country to the office of the lawyer who drew her will, whose office was situate in St. Joseph, and was presumably some miles distant from the testatrix's home. Such fact and circumstance does not raise an inference of undue influence upon the part of defendant.

One or two witnesses on behalf of contestants testified regarding certain statements purported to have been made by testatrix to the effect that the defendant "wouldn't let her (testatrix) have anything to do with the Shapter boys," and that defendant would not allow testatrix to invite or encourage any of the contestants to visit testatrix in her home. Such purported statements of testatrix are not to be viewed or considered as evidence of undue influence upon the part of defendant. [Adams v. Kendrick, 321 Mo. 310, 329, and cases there cited.] Speaking to that subect, in Teckenbrock v. McLaughlin, 209 Mo. 533, 550, this court has said: "If, therefore, we concede the admissions of the testatrix were to the effect stated, viz., that she was constrained by her other daughters to disinherit Bridget, and that they were exerting an undue influence upon her to that end, yet those statements are not to be taken as true for the purpose of establishing undue influence and defeating the will."

The evidence relied upon by contestants as establishing the existence of a confidential and fiduciary relation between the testatrix and defendant at the time of the execution of the will, and prior thereto, is summarized in our statement of the evidentiary facts to be found in a preceding paragraph of this opinion. It is unnecessary to again summarize and detail such evidence. Suffice it to say that such evidence, in our opinion, is wholly insufficient to establish the existence of such a confidential and fiduciary relation between defendant and his sister, the testatrix, as to give rise to a presumption of undue influence upon defendant's part, and to cast upon defendant the burden of showing that the will of testatrix was not the result of defendant's undue influence. While the evidence shows that testatrix consulted with defendant, at times, respecting her investments and limited business affairs, and that defendant advised testatrix, when consulted by her—as it was the unquestionable right and duty of a brother to do—yet such evidence falls far short of showing, or of tending to show, that defendant had charge or control over testatrix's business affairs, limited as they were, or that he dominated her acts and conduct, and her business transactions. The evidence shows that the greater part of testatrix's business dealings was transacted by and through an officer of the bank in which she kept her moneys on deposit to her personal account. Such checks upon testatrix's bank account as were proffered in evidence on the trial bore the signature of testatrix. The evidence does not show that any of the comparatively few loans, investments, and similar business transactions of testatrix were effectuated through the agency of the defendant. The evidence in the instant case wholly failed to establish the existence of a confidential and fiduciary relation between testatrix and defendant. [Canty v. Halpin, 294 Mo. 118, 136; Sanford v. Holland, 276 Mo. 457, 470; Van Raalte v. Graff, 299 Mo. 513, 529; Lindsay v. Shaner, 291 Mo. 297, 311; Winn v.

Grier, 217 Mo. 420, 460; Bushman v. Barlow, 316 Mo. 916, 947; Spurr v. Spurr, 285 Mo. 163, 178; Mayes v. Mayes (Mo., En Banc), 235 S. W. 100, 106.] The appellants rely strongly upon the opinion and ruling of this Division of our court in Mowry v. Norman, 204 Mo. 173, as supporting their insistence that the evidence herein is sufficiently substantial to establish a confidential or fiduciary relation, and to entitle them to the benefit of the presumption of undue influence upon the part of defendant. The evidentiary facts, as set forth in the opinion in the Mowry case, readily disclose that the evidence in that case bearing upon the matter of confidential relation was much stronger, and of far different character, than that relied upon by the contestants in the instant case. The evidence in the Mowry case showed that an aged and feeble testator lived with his son, the principal beneficiary of the testator's will, who, as the assumed agent of testator, managed and controlled all of his father's property interests and business affairs, gave the father what food and clothing he had to have, paid the father's physicians for their medical services, and even purchased for the father the tobacco he used, so that the testator was not in actual possession or use of any of his property or money.

It follows that the trial court should have directed the jury, as was requested by the defendant, that ''there is no evidence in the case that the defendant exercised any undue influence over the mind of the deceased, Belle Boyd, before or at the time the paper writing (will) introduced in evidence was executed.'' Inasmuch as the learned trial court submitted the issue of undue influence to the jury, and the jury reached a right result by returning a verdict sustaining and upholding the validity of the will, it is unnecessary that we discuss or rule the claim of procedural error assigned by appellants with respect to the giving of certain instructions on behalf of defendant defining the meaning and application of the term ''undue influence.''

The judgment herein was manifestly right, and should be affirmed. It is so ordered. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.