JAMES H. BUCKNER, Appellant, ELIJAH J. BUCKNER, Plaintiff, v. LEONARD J. TUGGLE, Executor of the Purported Last Will and Testament of MARY AGNES MITCHELL, Deceased, OTTO BLUE, RAYMOND BUCKNER, CATHERINE MING.—No. 40057.—203 S. W. (2d) 449.

Division Two, June 9, 1947.

Motion for Rehearing or to Transfer to Banc Overruled, July 14, 1947.

*J. E. Patton* and *Robert W. Hall* for appellant.

*Spencer M. Thomas* and *Harry Gershenson* for respondent Leonard J. Tuggle.

720

BARRETT, C.—Mary Agnes Mitchell died on April 21st, 1945 when she was almost eighty-five. She owned a two-family apartment house at 4235 Kossuth, assessed for tax purposes at $4100, and about $1500 worth of personal property, consisting chiefly of two $500 building and loan certificates. By her will, executed on the 20th of January 1945, she bequeathed $100 to each of her brothers, James and Elisha Buckner. She bequeathed $5.00 to her niece, Catherine Ming, $5.00 to her nephew, Raymond Buckner, and $5.00 to each of her other nephews and nieces. She appointed Leonard J. Tuggle executor of her will, made him the residuary beneficiary of her estate and specifically devised the apartment house on Kossuth to him, the devise reciting: "This devise is made in view of the facts that for a number of years Mr. Tuggle has cared for me and my business without compensation in a very satisfactory manner; when I could not get my brothers and relatives to care for me and my business, I could always depend on Mr. Tuggle to take care of both, and I now desire to compensate him in a small measure for his services."

Her brothers, James and Rev. Elisha, instituted this action to contest her will on the pleaded grounds of mental incapacity and undue influence exerted by Tuggle. The trial court submitted the case on both grounds, unsoundness of mind and undue influence, and the jury returned a verdict sustaining the will. Upon this appeal by one of the brothers, James, it is insisted that the court erred in refusing to give three of their instructions, one of which directed a verdict for them as contestants, and in giving three instructions for the proponents. However, all these assignments and the essence of this appeal have to do with but a single point and that is whether there was in addition to proof of a fiduciary relationship between Tuggle and Mary and benefaction to him also proof that he was active in some way which caused or induced or assisted in causing the execution of the will. Clark v. Powell, 351 Mo. 1121, 1130, 175 S. W. (2d) 842, 846; Pulitzer v. Chapman, 337 Mo. 298, 316, 85 S. W. (2d) 400, 409; Loehr v. Starke, 332 Mo. 131, 144, 56 S. W. (2d) 772, 777. It is not claimed that the three instructions given at the behest of the proponents on the subjects of unsound mind and undue influence were in and of themselves erroneous (but see Meyers v. Drake, 324 Mo. 612, 631, 24 S. W. (2d) 116, 124 and Carl v. Ellis, (Mo. App.), 110 S. W. (2d) 805) except in so far as they excluded or more accurately failed, in connection with undue influence, to charge upon the subject of confidential relationship, benefaction and activity on the part of Tuggle. The contestants' refused instructions likewise dealt with this subject and so, in fact, there is but the single question.

The apartment on Kossuth came to Mary upon the death of her second husband some time prior to 1927. She lived there for forty years, working all the while, even when she was approaching eighty, as a cleaning woman in office buildings. She had executed two previous wills. Her 1926 will gave her sister Katie, who was then married to John Green, one half of her ■■■■ property and the other one half was divided equally between her brothers, James and Elisha, and her sister Bessie. In 1939 her second will gave her property in equal shares to the two brothers and Katie. Bessie was then dead. Leonard Tuggle was a witness to that will which was drafted by Mr. Thomas who had been Mary's lawyer since 1927. In 1940 a codicil appointed Tuggle executor of her will in the place of her brother Elisha. The codicil was witnessed by Mr. Thomas, Mr. Gershenson and Miss Joby.

In 1927 Mary voluntarily caused the title to her Kossuth Street property to be transferred so that it stood in her name and that of her sister Katie as joint tenants with right of survivorship. But in 1943 Katie was about to marry Walter Chappel and Mary began demanding that title be restored to her or, as she put it, that Katie's name be gotten off the deed. Katie refused to reconvey the title and in June 1943 Mary instituted a suit to cancel the deed and compel a reconveyance and restoration of her title. In that controversy with Katie

the brothers, James and Elisha, advised Mary against the suit, giving as a reason for their positions her declining health. That suit was terminated by Katie's death but her experience with it and her brothers' position in it may have had some bearing on her future conduct even though they may have thought they were acting in her best interests.

Tuggle, a retired postal employee, came to live in the first floor quarters of Mary's apartment as a tenant, at twenty-five dollars a month rental, in 1932. He had not been there long, he says by 1934, until he began to do the necessary chores about the apartment such as mowing the lawn, trimming the hedge and firing the two furnaces. Everyone, including the contestants and their witnesses, said that Mary always spoke with high praise of Tuggle and said that he was nice to her. Until 1943 Mary was physically able to handle her own business and financial affairs. But during that year she began turning all of her business and financial affairs over to Tuggle. He did the shopping for her, paid her bills, collected money for her and finally had a joint savings account with her, though he never used it, and had access to her safety deposit box. He kept an accurate account of her receipts and of any expenditures on her behalf.

The contestants claim that Mary had been in bad health for years and that even by 1943 she was physically unable to care for herself. They claimed that, by the time she executed her last will on the 20th of January 1945, she was blind and so ill both physically and mentally that she lacked the capacity to execute a will. But the proponents' evidence tended to show that she was not blind, that during 1943 and 1944 she was in good health considering her advanced years and that she was mentally alert and fully capable of executing a will. Prior to 1945 she had been ill and under a doctor's care for short periods of time. Once, in 1940 and a part of 1941, her niece, Catherine Ming, came and lived with her while she was not so well. In the latter part of 1944 she became quite feeble and by January 1945 was quite ill and remained under doctors' care until she died on the 21st of April. During her illness Tuggle prepared and took meals to her. Some of the time he was her only nurse. Before she became so ill the brothers and their wives asked her to come live with them but the proponents' evidence tended to show that they always imposed as a condition to her coming to them that she turn her business and financial affairs over to them. One brother, James, testified that he did so talk to her because he wanted to see her treated right until she died.

On the 6th day of April 1945 James filed an information in the probate court charging that Mary was of unsound mind and incapable of managing her affairs. According to the proponents' evidence she was incensed at the proceeding and sent Tuggle to her lawyer, Mr. Thomas, with instructions for him to resist the suit. Mr. Thomas and his associate called on her and subsequently caused her to be examined by

a specialist in nervous and mental diseases. The doctors who treated her during March and April testified that she was of sound mind though physically ill. The specialist who spent three hours examining her on April 17th, in testifying in this suit, said that she was enfeebled, emaciated and not far from dead. He said, however, that she was very alert mentally as compared with her physical state and that she was of sound mind. The insanity proceeding was terminated by her death.

The weight and credibility of the evidence and the issues of unsoundness of mind and of undue influence in general were resolved by the jury's verdict and the appellant does not now assign error upon any of these matters. The facts are thus very briefly outlined as background for the presented question of confidential relationship between Tuggle and Mary, benefaction to him and activity on his part in the execution of her will.

The will was drafted by a lawyer, Robert L. Witherspoon, and was witnessed by him and his office associate, Lulu M. Howard, who was also librarian of Lincoln University Law School. He testified that he had not been previously acquainted with Mary but that two or three days prior to January 12th Tuggle requested him to call on her as she wanted him to draw a power of attorney for her. On the 12th he went to her apartment and Tuggle conducted him upstairs and introduced him to Mary. Tuggle left and the lawyer stayed about an hour. He said that she wanted him to draft a power of attorney giving Tuggle authority to handle her financial and business affairs. They discussed the power of attorney and she requested him to also draw a will. He said that she told him of her relationship to Tuggle and to her relatives. She told him about her property, her suit with Katie, her relatives and particularly about Rev. Buckner. He made some notations of what she desired, returned to his office and drafted the power of attorney and the will.

On January 20th Mr. Witherspoon returned with Mrs. Howard. Tuggle showed them in to Mary's apartment and left. Mary executed the power of attorney and he very slowly read the will to her, paragraph by paragraph. She declared it to be her will, signed it and he and Mrs. Howard signed as attesting witnesses. They both testified that she was feeble physically but of sound mind at the time. They gave Mary the will and power of attorney and departed. On the same day Mary gave the power of attorney and will to Tuggle and he put the will in her safety deposit box.

Tuggle testified that the power of attorney was occasioned by the fact that early in January Rev. Buckner came out and questioned his legal authority to handle Mary's affairs. He testified that he had never discussed a will with Mary and did not know that she intended discussing the subject with the lawyer. He said that she requested him to call the lawyer for the purpose of drafting a power of attorney.

He was not present on the 12th during the time the will was discussed or on the 20th during the time it was read and executed. There was no other evidence concerning the execution of the will and Tuggle's connection with it.

.It is the appellant's theory, under these circumstances, that there was a presumption of undue influence and that a verdict should have been directed against the will or, in any event, that the issue of confidential relationship, benefaction and activity should have been submitted to the jury. Clark v. Powell, supra; Odom v. Langston, 347 Mo. 1201, 152 S. W. (2d) 124.. Unquestionably, there was a confidential relationship between Tuggle and the testatrix and benefaction to him. but the fact of these two circumstances does not permit the further necessary inference that there was also activity on Tuggle's part in causing or assisting in causing the execution of the will. Annotations 154 A. L. R. 583, 584 and 66 A. L. R. 228. As was said in Pulitzer v. Chapman, 337 Mo. 298, 316, 85 S. W. (2d) 400, 409, "in addition to proof of the fiduciary relation and of a benefaction to or in the interest of the fiduciary, there be further facts and circumstances in evidence from which it can be inferred that the fiduciary beneficiary was active in some way which caused or assisted in causing the execution of the will." Such activity on the part of the fiduciary beneficiary may be inferred and established by circumstantial evidence. Clark v. Powell, 351 Mo., l. c. 1130, 175 S. W. (2d), l. c. 846. But the additional inference of activity and the resulting inference of undue influence may not rest upon conjecture but must be based upon evidence; circumstantial or otherwise, from which the necessary inferences may be fairly drawn. Rex v. Masonic Home, 341 Mo. 589, 613-614, 108 S. W. (2d) 72, 86. There was opportunity and motive for activity on the part of Tuggle and, from the contestants' viewpoint, an unjust result but these circumstances only give rise to suspicion and conjecture and standing alone do not permit the inference of activity. State ex rel. Smith v. Hughes, 356 Mo. 1, 200 S. W. (2d) 360, 363-364. The fact that Tuggle was a stranger in blood (Loehr v. Starke, supra), did the chores and rendered helpful service (Shapter v. Boyd, 327 Mo. 397, 37 S. W. (2d) 542) and that the relationship of landlord and tenant existed (Watson v. Taylor, (Mo.) 61 S. W. (2d) 326) do not demonstrate activity in the execution of the will.

Suspicion may arise from these circumstances and from the fact that the will was drawn by Witherspoon rather than by Thomas and from the fact that Mary gave the will to Tuggle who placed it in her lock box to which he had access. But from all that appears from the record Tuggle was no more than a mere messenger for Mary in asking Witherspoon to call on her. Shapter v. Boyd, supra; Winn v. Matthews, 235 Mo. App. 337, 137 S. W. (2d) 632. According to this record Tuggle did not know that Mary intended to execute a new will. He had not discussed it with her (Loehr v. Starke, supra) and was not present

when the will was discussed on the 12th or when it was executed on the 20th. State ex rel. Smith v. Hughes, supra. This circumstance does not necessarily establish that there was no undue influence but it does tend to negative activity.

In Clark v. Powell there was not only a confidential relationship and benefaction to the fiduciary but there were also circumstances from which the inference of activity on the part of the fiduciary beneficiary were reasonably permissible. There the beneficiary went to another town with the lawyer who drew the will and was probably present when the will was discussed. He was present when the will was executed and, under all the circumstances, it was a reasonable inference that he was active in causing or assisting in causing the execution of the will. In Odom v. Langston the draftsman of the will dealt with the beneficiary or her representative who was also a co-executor of the will and the evidence showed that the beneficiary was actively interested in having the testatrix execute a new will. And so it was in Pulitzer v. Chapman, there were other circumstances but in addition the fiduciary beneficiary arranged and attended conferences between the testatrix and her lawyer which resulted in substantial changes in her will.

In short the circumstances of this case bring it within Loehr v. Starke, Rex v. Masonic Home and State ex rel. Smith v. Hughes rather than within Clark v. Powell, Odom v. Langston and Pulitzer v. Chapman. Upon the whole record there was no evidence, circumstantial or direct, that Tuggle as a fiduciary beneficiary was active in causing or assisting in causing the execution of Mary Mitchell's last will, thereby creating the presumption of undue influence. It follows that the court did not err in failing to direct a verdict for the contestants or in refusing to charge the jury upon the subject of any presumption of undue influence arising from activity in the execution of the will by one who was a fiduciary beneficiary of the testatrix.

Accordingly the verdict and judgment sustaining the will is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.