Dianna Rae BLANKENSHIP (Carroll),
Appellant,

v.

Curtis D. BLANKENSHIP, Respondent.

No. 25922.

Missouri Court of Appeals,
Kansas City District.

Dec. 4, 1972.

Morris, Foust, Moudy & Beckett, Max Foust, Russell Jacobson, Kansas City, for appellant.

Sevier & Turnage, Robert F. Sevier, William E. Turnage, Liberty, for respondent.

Before SHANGLER, C. J., PRITCHARD and WASSERSTROM, JJ., and LAURENCE R. SMITH, Special Judge.

LAURENCE R. SMITH, Special Judge.

Defendant husband (respondent) filed a motion in the trial court to modify a divorce decree by changing custody of the two minor children born of the marriage between plaintiff and defendant from plaintiff to defendant. The trial court modified by granting defendant custody and plaintiff has appealed.

Plaintiff alleges the trial court erred because the evidence adduced on the question of the plaintiff's care of the children failed to establish that a change of condition had occurred and that such a transfer was for the welfare of the children, and alternatively, because the trial court erred in refusing to allow plaintiff to present further evidence on the question of medical treatment of the minor son Kelly.

As stated in Noble v. Noble, Mo.App., 341 S.W.2d 307, 310, cited by plaintiff:

"The burden of proof is on the one seeking a change of custody to show by the preponderance of the evidence, not only that there has been a change of conditions, but also that the welfare of the

child requires a change of custody by reason thereof. * * * It is also our duty to review the whole record, and arrive at our own conclusion in the matter, but in performing this duty we must bear in mind that the findings of the trial court should not be lightly disturbed. In fact, such findings will ordinarily be deferred to, unless from a consideration of all the facts and circumstances it appears that said findings are in conflict with a clear preponderance of the evidence so as to disclose a manifest abuse of judicial discretion."

Also it is the rule or principle that the custody of children of tender years preferably should be placed with the mother. Clinton v. Clinton, Mo.App., 444 S.W. 2d 677, 682; Baker v. Baker, Mo.App., 475 S.W.2d 130.

Defendant seeks to justify the action of the trial court in transferring custody of the two minors to him on the following bases: (1) the poor living conditions of the children with plaintiff; (2) the children were exposed to influences that were not good for them (in particular, in being taken into bars); (3) moral conduct of the stepfather Mr. Carroll, with respect to his cursing and drinking, his threatening a witness, and the giving of bad checks and leaving rent unpaid; (4) poor attendance of the children in church and Sunday school when with plaintiff (as compared to defendant); (5) failure or refusal of plaintiff to show motherly interest in the children; (6) plaintiff's failure to properly respond to the illnesses of the children; and (7) the good care the children would receive from defendant and his wife.

Plaintiff was granted a divorce from defendant on November 8, 1968 and was given custody of the two minor children, both boys. Kelly was then about four and Kerry was about two. Defendant was given temporary custody on alternate weekends and for six weeks each summer.

Following the divorce, plaintiff and the children lived with plaintiff's mother for a short time and then plaintiff married one Jim Carroll. Mr. Carroll had custody of three children by a previous marriage: two sons, Terry, age 20, and Jimmy, age 16; and a daughter, Kelly, age 2. (These are the approximate ages as of the time of the marriage of plaintiff and Mr. Carroll.) Plaintiff and her new husband, Mr. Carroll, and the children of each, have subsequently lived in Trimble, Excelsior Springs and Lawson. They have mostly lived in a two-bedroom trailer home. At the time of the modification hearing (August 1970) they lived in the trailer near Lawson. Mr. Carroll operates a TV repair shop on the premises near the trailer and also has a retail shop in the town of Lawson.

Defendant married his present wife Joyce on March 8, 1969. There are no children by that marriage. He has been employed by the Ford Motor Company for seven years as of the time of the hearing. Joyce was employed as of that time by Waddell and Reed but planned to quit if defendant received permanent custody of his two children. Defendant and his present wife live in a small house in Smithville. They are in good health. Joyce testified at the hearing; Mr. Carroll did not.

At the time of the hearing there were six persons living in the two-bedroom trailer of the Carrolls: plaintiff and her husband, and Betty and Jimmy Carroll, and Kelly and Kerry Blankenship. And since plaintiff was pregnant there would soon be another one. The Carrolls rented the premises on which were situated their trailer, the TV repair shop and a small lake. Plaintiff testified that they were planning on building an addition to the trailer.

Plaintiff worked with her husband in the TV repair business and would often travel with him on jobs. There was evidence that plaintiff used a variety of baby-sitters.

Three witnesses testified as to the children, Kelly and Kerry, being with the Carrolls at taverns where intoxicating liquors were sold. The Carrolls would have drinks at the taverns, but plaintiff testified they only went where the children could eat.

Defendant testified that on one occasion, over the phone, Mr. Carroll threatened to take defendant's life if he didn't bring the children home that evening. Defendant further testified that Mr. Carroll had slurred speech and was cursing, and that he (defendant) told Mr. Carroll that he would not return the children while he (Mr. Carroll) was intoxicated.

One witness who testified as to seeing the Carrolls and the children in a tavern further testified that when he saw Mr. Carroll on the street the night before the hearing Mr. Carroll made statements to him indicating a threat if he appeared in court to testify.

There was testimony that the Carrolls' home was kept in a messy condition; and that when they moved from a rented house in Trimble rent was owing; and that bad checks were given for rent.

There was evidence of Mr. Carroll frequently arguing and quarreling with defendant when defendant was picking up or returning the children and that Mr. Carroll would not allow defendant to communicate with plaintiff. On one occasion when defendant asked Mr. Carroll about bruises on the children's bottoms Mr. Carroll blew up and said it was none of defendant's business.

Defendant testified that Mr. Carroll refused to allow defendant to pick up the children one evening when they were supposed to be participating in a wedding of defendant's sister. Defendant testified that Mr. Carroll had been drinking; that he had bloodshot eyes and couldn't stand straight. Defendant later went back to the Carrolls with a police officer. On another occasion defendant found it necessary to take police along when going to the Carrolls.

There was testimony that when defendant received the children for visitation they were unkempt, their hair in need of cutting, and their clothes were ill-fitting. Defendant's present wife testified that when the children are being returned to the plaintiff's at the end of the weekend visit, "they ask us not to take them home."

Plaintiff had not taken the children to Sunday school or church during the four months, immediately prior to the hearing, that she and the family had been living in Lawson. On the other hand, when defendant had temporary custody of the children they attended Sunday school and church. Plaintiff testified the children had attended Sunday school when they lived in Excelsior Springs.

In May 1969, upon complaint that the two children in question were being mistreated, the juvenile office of Clay County checked on the children. Bruises were observed on the buttocks, chest, and face of Kelly and of Kerry. Mr. Carroll explained the bruises by stating that the boys tumble and fall a lot. Plaintiff expressed the view it was from their playing. No charges were brought in the juvenile court, but the Carrolls were given warning. One juvenile officer testified that at a later date there were small sores on the children's legs that looked like impetigo and that there were no signs of medication. Plaintiff testified that she took Kerry to a doctor because of sores on Kerry's leg.

Kerry, the younger son, has an asthmatic problem, with a history of asthmatic attacks. Defendant took him to a doctor in the spring of 1970 and there was a flare-up in the summer of 1970 while he was with defendant. Defendant testified he did not get an opportunity to discuss this condition with plaintiff. However, plaintiff testified she is aware of the problem and has taken him to the doctor.

There was considerable evidence relating to a medical problem of Kelly, the older son. In the summer of 1969, while defendant had temporary custody, Kelly developed severe headaches and he was taken to the Smithville Hospital where he was treated by a Dr. Chiles and given a prescription. Dr. Chiles was the family physician for defendant and he had been Kelly's physician since birth. Defendant testified that Kelly's disability was diagnosed as epilepsy. There was conflicting evidence as to whether or not plaintiff was advised by defendant as to Kelly being in the hospital.

Defendant testified that when he took Kelly back to plaintiff's home (after the six-week temporary custody) he gave the prescription medicine to Mr. Carroll. Two weeks later Mr. Carroll said he didn't have the medicine, and defendant had the prescription refilled. At the end of the following two weeks Mr. Carroll told defendant he had thrown the medicine away.

Plaintiff testified that after learning of Kelly's hospitalization she called Dr. Chiles (who had treated Kelly) and he advised her that Kelly had headaches caused from epileptic tendencies. She further testified that after Kelly returned to her after the temporary custody with defendant, and after learning of an appointment for Kelly with Dr. Chiles, she called Dr. Chiles, and then made an appointment instead with Dr. James Allen, M.D., Excelsior Springs, who lived closer to plaintiff. Plaintiff testified that she went to see Dr. Allen; that he gave a prescription for Kelly; and that he requested the records from Dr. Chiles but that the records were never forwarded. Plaintiff never did go in to see Dr. Chiles. Dr. Allen subsequently moved to Springfield, Missouri.

At the conclusion of plaintiff's evidence, on August 25, 1970, defendant's attorney stated that the only possible rebuttal ws with reference to what Dr. Allen said. When question was raised as to hearsay, plaintiff's attorney stated that, "perhaps we could provide you with medical records." In order to give the attorneys opportunity to get the records of Dr. Allen, the case was continued to September 10. The record shows the case was then continued to September 24, 1970.

On September 24 defendant produced a school record pertaining to Kelly and showing his surname as *Carroll*, and also a record of Dr. Allen, which had apparently been obtained from a Dr. Soper, who had taken over Dr. Allen's practice. Plaintiff's attorney stipulated that the exhibits might be used and said, "we would like to ask leave so we may have an opportunity to present rebuttal testimony later to these exhibits."

The record of Dr. Allen contains notations under date of August 26th, 1969 as to Kelly being in the hospital that summer with "serious nerve condition," as to medicine prescribed, as to being OK since being home, and as to a diagnosis by Dr. Chiles of "early epilepsy." Then appears the notation: "9/29/69—Note that pt. has not been seen by me or treated professionally to date."

Defendant then put on the witness stand the kindergarten teacher of Kelly. Among other things, she related that Kelly became ill in class on the first day of school, had a headache, was vomiting, was sweating and had a red face and dizzy spells. The teacher offered to send him home by the principal. Plaintiff declined this offer and sent Kelly's 16-year-old stepbrother with a panel truck after him. The stepbrother didn't arrive until an hour had elapsed. The teacher also related another instance of unusual behavior of Kelly at school: when he spent the recess hiding under her desk.

At the conclusion of this testimony plaintiff's attorney stated: "we renew our same request with regard to this witness about rebuttal." After some colloquy as to the availability of other counsel for the plaintiff, the case was continued to September 25, 1970. On that date plaintiff's

counsel said he would like to call the plaintiff to the stand but that "she is under a doctor's care and cannot be here today"— that "she is in term pregnancy."

The trial judge then remarked that there was "considerable discrepancy in the testimony of plaintiff and the exhibits that have been filed as far as the treatment of this one child," and "as a result of that, and observing the plaintiff, I have reasons to believe that I can only give a very token consideration to her testimony." The court concluded it was in the best interest of the two children that they be with the father instead of the mother and stepfather and entered judgment accordingly.

Did the court err in changing custody of the two children from plaintiff to defendant? Part of the problem stemmed from the conduct of plaintiff's present husband, Mr. Carroll. However, he is necessarily a factor in evaluating plaintiff's custody of the children. There were inconsistencies in the testimony of the witnesses. The appearance and demeanor of the witnesses were necessarily considered. We must give deference to the trial court's conclusions on such matters.

We believe there was substantial evidence from which the trial court could conclude that there has been a change of conditions since the divorce; that the children are not being properly cared for by plaintiff and her present husband; that defendant and his present wife are in position to give proper care and attention to the children; and that the children's welfare and best interests require the change of custody.

Alternatively, plaintiff urges that the trial court erred in refusing to allow plaintiff to present further evidence and that the case should be remanded for the presentation of further evidence. Plaintiff contends that she should have been permitted to testify with respect to Dr. Allen's record.

Plaintiff *did testify* in detail as to her dealings with Dr. Allen. It is not indicated as to how plaintiff might negate the effect of Dr. Allen's records other than to repeat what she had already testified to.

 Plaintiff filed no written application for continuance on account of the absence of a witness. Nor did plaintiff's oral request reflect diligence, the materiality of the evidence, or other essential prerequisites as set out in Mo.Rule 65.04, V.A.M.R. Furthermore, it is noted that plaintiff did not allege refusal to grant a continuance as a grounds in her motion for new trial. It is within the sound discretion of the trial court to grant or refuse a continuance. Clinton v. Clinton, Mo.App., 444 S.W.2d 677, 680. There was no abuse of that discretion.

We conclude there was not a manifest abuse of judicial discretion by the trial court in entering judgment modifying the divorce decree and transferring custody of the two minor children from plaintiff to defendant.

Accordingly, the judgment of the trial court is affirmed.

All concur.