In the Matter of the ESTATE of Almeda ANDERSON, Deceased.

James P. AYLWARD, Administrator, et al., Respondents,

v.

Syble REIFSTECK and Glenn Reifsteck, Appellants.

No. KCD 27861.

Missouri Court of Appeals, Kansas City District.

Oct. 12, 1976.

Motion for Rehearing and/or Transfer Denied Nov. 4, 1976.

Application to Transfer Denied Jan. 10, 1977.

C. John Forge, Jr., Independence, for appellants.

Edward L. FitzGerald, Eileen S. Sullivan, Joseph H. Moore, Kansas City, for respondents.

Before DIXON, P. J., PRITCHARD, C. J., and WASSERSTROM, J.

WASSERSTROM, Judge.

A number of the heirs of Almeda Anderson instituted this proceeding to discover assets in the Probate Court of Jackson County, Missouri, pursuant to § 473.340 RSMo Supp.1973. (All other statutory references in this opinion are to RSMo 1969). The petition alleged that defendants Glenn Reifsteck and his wife Syble Reifsteck had concealed and withheld from the estate certain enumerated property of the deceased. The Probate Court certified the issue to the Circuit Court of Jackson County on its own motion for the reason that probable cause existed to believe that any judgment rendered in the Probate Court would be appealed. The individual petitioners (a brother of the deceased, and a number of her nieces and nephews), just prior to closing arguments, renounced their interest in any recovery and stated that any money judgment should be found in favor of Stanley L. Morris as Public Administrator of the estate. The jury returned a verdict and judgment was entered that "plaintiff have and recover of and from the defendants the sum of Ninety-Nine Thousand Nine Hundred Ninety-Five ($99,995.00) Dollars, together with the costs. . . ." Glenn and Syble Reifsteck appeal. On motion filed in this court, James P. Aylward, the present Public Administrator, has been substituted as a party in lieu of Morris, his predecessor in office.

The facts, viewed, as they must be, in the light most favorable to the jury verdict, are as follows. Mrs. Anderson, known to her friends and relatives as "Allie," had, since the death of her husband in 1962, lived alone in Independence, Missouri, in a duplex which she owned. Although she was well off—her probate estate, excluding the bulk of the transferred assets now in dispute, amounted to $127,000—Mrs. Anderson was extremely frugal by nature. She often bought her clothes at garage sales, she skimped on groceries and would have the neighbor children bring her food, and when she and her friends went out to lunch, she would limit the amount that she spent on her lunch to $1.00. Mrs. Anderson seldom made gifts, and was advised by her husband before he died not to make loans, advice which she followed religiously. Her money was largely scattered in various savings accounts with a lesser amount invested in stock. Her closest living relatives were her brother and a number of nieces and nephews who lived in St. Louis and in Arnold, Missouri. She had a number of friends in Independence whom she saw frequently.

In July of 1973 she became ill and on July 12 was taken to the Independence Sanitarium from whence she was released July 21, her ailment diagnosed as a slight stroke (as well as hypertension, arteriosclerotic cardiovascular disease) from which she had not fully recovered. The hospital records indicate that one of her symptoms was a confusion and a lack of orientation. Although not fully able to fend for herself, she did not want to pay the money necessary to hire someone to care for her. Layard Reifsteck, a nephew, visited Mrs. Anderson for a few hours on the day that she was released from the hospital as he and his family were passing through Independence on a vacation to Colorado. The next day, July 22, Kathryn Moore, one of Mrs. Anderson's friends, called the home of another of Mrs. Anderson's nephews, Glenn, and told Syble, his wife, of Mrs. Anderson's condition. Syble packed immediately and, with her daughter Michelle, caught a plane from her home in Arnold to Kansas City. When Syble and her daughter arrived, Mrs. Anderson was unable to answer the door and her condition was described by friends as very poor.

Syble had left her home in Arnold without telling her husband, Glenn, who had been out of town on business when she left. One of Mrs. Anderson's friends, Pauline Bruns, overheard her conversation with Glenn in which she called to tell him of her whereabouts and that he should join her immediately, because they had a chance to "get (their) name on this house, this duplex." Glenn joined his wife and daughter at the home of Mrs. Anderson on July 23. The next day, instead of encouraging Mrs. Anderson to rest, they procured a wheel-

chair and took her to visit the bank and the title insurance company. At the First National Bank of Independence, they entered Mrs. Anderson's safe deposit box where Glenn found her will, and announced after reading it that the will, being five years old and naming a number of individuals who were no longer alive, was no longer any good. Glenn's name was added as a deputy to the safe deposit box, and the group proceeded to the St. Paul Title Insurance Company where a deed to the duplex was drafted wherein Mrs. Anderson conveyed the duplex to herself and Glenn Reifsteck as joint tenants. In the next few days, a number of financial transactions either took place or were begun; Mrs. Anderson opened a joint account for herself and Syble Reifsteck; $70,489.30 in funds which had been scattered in seven savings and loan associations were placed for collection to be consolidated; and stock transfer and assignment forms were drawn up but not executed.

On August 3, 1973, Layard and his family stopped again to visit Mrs. Anderson on their return trip from the Colorado vacation. They spent an enjoyable evening, stayed the night and departed amicably the following day. During the visit, Syble had occasion to make a number of remarks on Mrs. Anderson's wealth.

In the next week, the $70,489.30 which had been collected by the First National Bank of Independence from the seven savings and loan associations was put into a certificate of deposit, which would yield higher interest than the isolated savings accounts. This was done even though Mrs. Anderson had earlier rejected any alternative which would increase her money's yield because she didn't want to pay any more income tax.

On August 11, one week after their last visit, Layard and his wife returned to Independence to visit Mrs. Anderson but got a much different reception this time. They approached the house and were greeted by Glenn and Syble on the front porch with the news that Mrs. Anderson did not want to see them. They talked quietly for a few

minutes when Mrs. Anderson's friends, Ed and Pauline Bruns, arrived, having been warned by Syble that they should get "over here quick, because they (Layard and his wife) will cause trouble and Aunt Allie will be sicker than ever." A few minutes later, the police arrived. Mrs. Anderson had summoned the police to remove Layard from the premises. She came to the door only long enough to confirm to the police her desire that these people leave, and to say "Layard, I've heard a lot of things."

In the following days, Syble refused to allow relatives to visit Mrs. Anderson and even many of her close friends were not allowed to see her. Syble answered the phone and screened Mrs. Anderson's phone calls. She saw only those who Syble wanted her to see, and heard only what Syble wanted her to hear. She was told that all of the other relatives were "pretty bad people"; that two of the nieces had wanted to put their mother in a nursing home (Mrs. Anderson had a fear and a dislike of all medical institutions); that one nephew was a "no good son-of-bitch"; that her living brother, Henry, was dead; that her good friend, Kathryn Bullard, was after her money and had stolen a pass book and a quilt. During all of this time, Mrs. Anderson could not get around without the help of Syble or Glenn, and relied upon them for all her needs including nursing, meals, laundry, opening the mail, and getting business done.

On August 13, Syble took Mrs. Anderson to a lawyer in Independence to make a new will. This revised will left $10,000 to the Masons (her husband had been a Mason) and the same amount to her church, $20,000 to her friend, Kathryn Moore, $3,000 to each of three other friends, $5,000 to yet another friend, and $100 each to two nieces and one nephew. The will named her lawyer as executor and specifically bequested $5,000 to Glenn. The residue of the estate was left to Syble.

A friend, Kathryn Moore, who visited Mrs. Anderson on August 22, noted that her condition had worsened; she couldn't get up at all, she had to have people carry her

to the bathroom a number of times during the visit, she had extremely high blood pressure (300/100—the highest that Mrs. Moore's equipment would register), she couldn't talk, and her complexion was ashen in color. Another friend noted Mrs. Anderson's weakened condition and observed that she was incapable of carrying on a conversation. At this time, another series of financial transactions began. On the afternoon of August 22, Syble took Mrs. Anderson to First Federal Savings to withdraw her balance there. On the morning of August 23, Glenn and Syble took her to Arnold, Missouri. A series of checks, dated August 20, 22 and 24, were drawn and made payable to Syble, totaling $43,000, which were in addition to a previous check in the amount of $5,000 drawn on July 30, 1973, payable to Syble. On August 23, Glenn entered the safe deposit box and cleaned it out. Various accounts held by Mrs. Anderson in Independence were closed and the funds forwarded to a bank in St. Louis (which is near the home of Syble and Glenn) for deposit in a time certificate.

On September 13, Glenn took Mrs. Anderson to have another will drafted in St. Louis. That will, in which Mrs. Anderson signed her last name on page two as "Adderson" was different from the will dated thirty days before in that Kathryn Moore's devise was cut from $20,000 to $10,000, the Masons, the church and Mrs. Clary were cut out entirely and each of the nephews and nieces (other than Glenn) received $100. Glenn was appointed executor in addition to receiving the $5,000 bequest. The residuary estate, which had increased considerably by reason of reduction of specific bequests, went to Syble.

On September 14, the day after executing the will, and after staying at Glenn and Syble's house for three weeks, Mrs. Anderson entered Missouri Baptist Hospital in St. Louis County. Although 73, she gave her age as 68 and could not give a medical history. Examinations showed that she was somewhat confused and disoriented and had lapses of memory. The hospital medical records contain a report dated September 19, 1973, relating that "medical status examinations reveal that the patient is oriented to the year and the month but is unable to state the day of the week correctly. She is unable to recall the name of her present attending surgeon and cannot recall the name of her referring physician. She is able to state her full name but is unable to give the year of her birth. She is unable to do serial sevens and cannot count backwards from ten. She is able to repeat, in order, four numbers correctly but is unable to repeat five numbers."

About the same time that Mrs. Anderson entered the hospital, the stock transfer forms which had been drawn up earlier were executed and stock certificates worth in excess of $20,000 which had been taken from the safe deposit box by Glenn, were given to Glenn by Mrs. Anderson. A number of other checks passed hands in the next few days, and a new joint account was opened in the names of Syble and Mrs. Anderson, with an initial deposit of $26,484. Syble called the First National Bank of Independence several times and requested that the proceeds of the $70,489.30 certificate of deposit taken out by Mrs. Anderson in August be forwarded to her. The bank refused to forward the funds without speaking personally to Mrs. Anderson, which contact was never made. Mrs. Anderson had funds of over $16,000 in the Vendo Credit Union. On September 21, 1973, the Union received a sight draft for that deposit with accrued interest to be paid to the newly opened St. Louis bank account in the joint names of Syble and Mrs. Anderson. That draft, however, was never paid by the Vendo Credit Union because of the quality of Mrs. Anderson's signature.

Mrs. Anderson died in the hospital on September 24, 1973. Syble then called one of Mrs. Anderson's friends in Independence, and the friend notified Mrs. Anderson's other friends and relatives who had not even been informed that she had been in the hospital.

■ Defendants Reifsteck list seven Points Relied On in their brief. Of those,

Point II complains of Instruction No. 3 and Point VI asserts error with respect to the giving of Instruction No. 2. However, defendants have not set forth either of those Instructions in the argument portion of their brief as required by Rule 84.04(e). These points therefore present nothing for review and will not be further noticed. *State v. Tash*, 528 S.W.2d 775, 783[28] (Mo. App.1975); *State v. Mesmer*, 501 S.W.2d 192, 197[12] (Mo.App.1973); *Sippel v. Custom Craft Tile, Inc.*, 480 S.W.2d 87, 91[6] (Mo.App.1972). The other Points Relied On will be discussed in order.

## I.

In their Point I, defendants assert that the trial court "erred in setting the trial at a time and place which prevented defendant Sybil [sic] Reifsteck to be present and to defend herself." The facts with respect to this contention are as follows. On motion of the petitioners, the trial court advanced the case on the docket and set it for trial on November 18, 1974. Defendants' attorney then filed a motion for continuance based upon his engagement on the same date in a lower numbered cause, and this case was thereupon postponed until December 2, 1974.

Then on November 26, 1974, defendants filed another motion for continuance of which the following constitutes a full quotation:

"Comes now the Respondent and for their [sic] Motion for Continuance states to the Court as follows:

"1. That the Respondent is in need of continuance because the Respondent, Sybil [sic] Reifsteck is presently confined to a hospital in Springfield, Missouri under orders of the United States District Court for the Eastern District of Missouri for a period of sixty days (60) and is unable to attend trial set on this cause on December 2, 1974.

"WHEREFORE, Respondents [sic] pray for an order of the Court for continuing the case until such time as Respondent has been released from the hospital."

When the trial court overruled that motion and indicated that the case would have to proceed to trial as set, defendants filed application to this court for writ of prohibition. A stop order was issued and thereafter the parties filed briefs and supporting documents in this court.

From the file in the prohibition case, of which this court takes judicial notice, it appears that Syble Reifsteck was indicted by a federal grand jury in St. Louis on September 18, 1974, for violations of the federal counterfeiting statutes. In connection with that criminal proceeding, the federal district judge on November 21, 1974, ordered that Syble Reifsteck be sent to a federal hospital facility in Lexington, Kentucky, for examination into her mental condition, that examination to be completed and a report submitted to the district court within sixty days. The petitioners in this proceeding filed brief in this court arguing that the funds which Syble Reifsteck and her husband had obtained from Mrs. Anderson could well be dissipated in the defense of the criminal counterfeiting charge and in other ways, so that delay in hearing the present proceedings could very well frustrate its purpose. After considering the entire factual situation, this court dissolved its stop order and denied the petition for prohibition on December 5, 1974.

Promptly after entry of that order by this court, the trial judge reset this case for trial on December 16, 1974, and the case did proceed to trial on that date. The trial court was faced with a basic situation which called loudly for a prompt trial. Even if defendants had meticulously followed all the proscribed procedures, it would be most difficult to find fault with the trial judge's determination to refuse further continuances and to insist upon the case proceeding with dispatch.

■ However, the decisive factor with respect to this procedural point is that defendants did not follow the procedures for a continuance required by Rules 65.03 and 65.04. First of all it must be noted that the defendants never filed any motion for con-

tinuance of any kind when this trial was finally reset for December 16, 1974. But even if it should be considered that the motion filed on November 26, 1974, had some continuing vitality, that motion itself was fatally defective. It was not verified as required by Rule 65.03, nor did it show as required by Rule 65.04 that the defendants had exercised due diligence to obtain the presence of Syble Reifsteck or her testimony; in this connection, it should be noted that the deposition of Syble Reifsteck was taken on November 4, 1974, but counsel for defendants successfully opposed the use of that deposition for any purpose during the course of this trial. Further, the application did not show what particular facts Syble Reifsteck could provide which could not be fully proved in other ways, and the application did not make the required statement that Syble Reifsteck was not absent by connivance or consent and that the application was not made for vexation or delay. Because of the failure to comply with the court rules mentioned, aside from anything else, the overruling of the application for continuance cannot be considered an abuse of discretion. *Jones v. Jones,* 188 Mo.App. 220, 175 S.W. 227, 228 (1915); *Searles v. Searles,* 495 S.W.2d 759, 766 (Mo. App.1973); *Blankenship v. Blankenship,* 488 S.W.2d 245 (Mo.App.1972).

## II.

Defendants' Point III is that "the Court erred in not submitting the cause to the jury for its determination in accordance with 473.340 [sic]." It is very doubtful whether this point complies with Rule 84.-04(d), since this point hardly states "wherein and why" the action of the trial court is claimed to be erroneous. Nevertheless the argument portion of defendants' brief does make it clear that defendants' objection is that the judgment did not "determine the persons who have an interest in said property together with the value and extent of any such interest." The Point will be considered as so amplified.

The conflicting claims in this case are sharp and simple. The petitioners at all times have maintained that all of the property transferred to defendants during the last three months of Mrs. Anderson's life rightly belonged to Stanley L. Morris as the Administrator of her estate. Defendants, on the other hand, say that they and they alone are entitled to all of the property in question by way of gifts made to them by Mrs. Anderson during her lifetime.

The whole purpose of this proceeding was to determine which of these conflicting positions should prevail. That was done by the jury determination that the gifts were obtained through undue influence and that accordingly all of the property in question or its substitute value in cash belongs to the Administrator. The purpose of § 473.340–3 has therefore been fully served by the verdict and the judgment entered thereon. The identification of the heirs and how much each is to take still remains for decision in the Probate Court, which is indubitably the proper forum for that purpose.

The argument portion of defendants' brief contains a Point VIII which does not conform to any point in the Points Relied On section of the brief. This additional point contained in the argument portion may have been intended to be included within Point III of the Points Relied On, which is the one presently under consideration, and will be so treated. The additional argument VIII is that "the instructions failed as a matter of law to conform with Section 473.340 Mo.Rev.Stat.1969 as amended." A complete answer to this argument has already been given: no complaint concerning the instructions in this case can be heard because no instructions have been set forth in the brief, thereby violating Rule 84.04(e).

## III.

For their Point IV, defendants argue that "the court erred in not dismissing the cause of action after the disclaimer filed by the petitioners." The procedural situation to which this point relates is that the original petition in the Probate Court was filed by individual heirs, and the Public Administrator was not named as such in the

body of the petition as being one of the petitioners. At the close of the evidence in the Circuit Court, the individual heirs made a disclaimer of "any right to a money judgment in this cause of action and state that any money judgment should be ·found in favor of Stanley L. Morris as Public Administrator of the Estate of Almeda Anderson." Defendants argue in effect that since the Administrator was not a named petitioner, that the disclaimer by the heirs who were named petitioners left the case in a status without any petitioner and that therefore the proceeding should have been dismissed.

This argument overlooks a number of important points: (1) the original petition in the Probate Court was filed by the named petitioners on behalf of the Public Administrator, the prayer of the petition being "that the court make and enter its order directing the delivery and transfer of the title and possession of the property described in paragraph 2 hereof to Stanley L. Morris, Public Administrator * * * ."; (2) the order of the Probate Court certifying the proceeding to the Circuit Court refers to advice of counsel for the Administrator as to the nature of the controversy and then proceeded to order that the petition to discover assets "heretofore filed herein by the administrator" is certified to the Circuit Court; (3) the Administrator and his attorney participated fully in each stage of this proceeding, including the prohibition proceedings previously before this court and also including the present appeal; (4) at the close of the evidence in the Circuit Court and immediately preceding the disclaimer made by the individual petitioner-heirs, the Public Administrator filed and the court accepted his verification to the Petition for the Discovery of Assets; and (5) when this case was submitted to the jury, the court's instructions all referred to "plaintiff" in the singular, as did the jury verdict and the court judgment.

Section 473.340–4 requires that "the court shall order the joinder of the personal representative of the estate if he is not named as a party." That, in effect, was done by the Probate Court, and that joinder was in effect accepted by the Circuit Court. If there can be any doubt in that respect, the result must be deemed accomplished by way of amendment to conform to the proof. Section 473.340–2 provides that these proceedings are to be governed by the Missouri Rules of Civil Procedure; and the amendment, if necessary, can be deemed accomplished under Rule 55.33(b).

### IV.

Defendants next complain that this case went to trial without a verified petition. Although defendants note that the petition here was verified by the petitioners' counsel, they insist that such verification is ineffective and that valid verification can be accomplished only by the party himself.

Without in any way intimating that the verification by attorney was insufficient, defendants' point regarding the verification is completely answered by the fact that before submission of this case additional verifications to the petition were made by both Layard Reifsteck, one of the named petitioners, and also by Stanley L. Morris, the Public Administrator.

Still further, any defect in the verification has been cured by judgment. Section 472.080–2 and Rule 74.30.

### V.

Under their Point VII defendants argue that the evidence was not sufficient to support the jury's verdict of undue influence. A look at the record convinces to the contrary.

The following facts are prominent in affording a sound basis for the jury's finding: (1) Mrs. Anderson left the Independence Sanitarium on July 21, 1973, sick, weak in body, and confused in mind; (2) during the period from July 22, 1973, until at least her admission to the Missouri Baptist Hospital in Clayton on September 14, 1973, Mrs. Anderson was completely dependent upon defendants for her day to day needs, and from August 23, 1973, until September 14, 1973, Mrs. Anderson was in defendants'

home where they had taken her from Independence; (3) defendants, especially Syble, monitored all telephone calls and visits to Mrs. Anderson and isolated her from other relatives and many of her old friends; (4) defendants poisoned Mrs. Anderson's mind against her relatives and at least one of her old friends; (5) defendants took Mrs. Anderson on a number of trips to banks and to a title company for the purpose of accomplishing transfers of property to their advantage; (6) Glenn told Mrs. Anderson at a very early opportunity that her existing will was no longer any good, and he and Syble then proceeded to take her to lawyers twice within a period of one month in order to make new wills, each will being progressively more favorable to defendants.

The foregoing factors amply justify the jury's conclusion that defendants did procure the transfers in question through the exercise of undue influence. *Godsy v. Godsy,* 504 S.W.2d 209 (Mo.App.1973); *Switzer v. Switzer,* 373 S.W.2d 930 (Mo.1964).

### VI.

Respondents filed a motion in this court to dismiss the appeal on the ground that the brief on behalf of Syble Reifsteck and Glenn Reifsteck fails to comply with Rule 84.04. That motion was overruled by this court on August 22, 1975. At the time of oral argument, respondents requested that their motion to dismiss be reconsidered. In view of the decision reached herein to affirm, a reconsideration of the motion to dismiss would serve no useful purpose.

Affirmed.

All concur.