John L. SALISBURY et al., Respondents,

v.

Henry GARDNER and the Unionville Ladies Cemetery Association, Appellants,
and
L. E. ATHERTON, Executor of the Estate of Martha Salladay, Deceased, and Mauretta Carder, Defendants.

No. KCD 26396.

Missouri Court of Appeals, Kansas City District.

Sept. 3, 1974.

Motion for Rehearing and/or Transfer Denied Oct. 7, 1974.

Application to Transfer Denied Dec. 16, 1974.

Jayne, Oswald & Cottey, Kirksville, for appellants.

Robert E. Sharp and Robert Ernest Gould, Kansas City, Wilbur L. Pollard, North Kansas City, for respondents.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

SWOFFORD, Judge.

The last will and testament of Martha Salladay was contested by eight nieces and nephews (respondents here), her heirs at law who were excluded as legatees under the will.[1]

The will here in question bequeathed 75% of the residue of the estate to the appellant, Henry Gardner; 10% of the residue to the appellant, The Unionville Ladies Cemetery Association; and 10% of the residue to a niece, Mauretta Carder; and it named L. E. Atherton as Executor. Atherton and Carder, although defendants in the will contest, did not appeal from the judgment below.

The case was tried before a jury and a verdict was rendered finding that the document in question was not the last will and testament of Martha Salladay and a judgment was entered accordingly. All defendants filed after-trial motions, which were not ruled on by the court below within ninety days, and consequently were deemed denied. Rule 78.04, V.A.M.R. Defendants Gardner and Cemetery Association duly appealed from the judgment.

Although the plaintiffs' petition alleged that the testatrix was incompetent at the time of the execution of the will and evidence was offered in proof of such allegations, the plaintiffs' case was submitted to the jury solely upon the theory that Martha Salladay signed the document as a result of the undue influence of Henry Gardner. No question is raised on this appeal as to the propriety of the instructions.

The sole point on appeal is the contention by appellants that the plaintiffs failed to offer sufficient evidence to authorize the submission of the case to the jury upon the issue of undue influence and, therefore, the trial court erred in failing to direct a verdict in favor of the proponents of the will.

In this posture of appeal, we must take the contestants' evidence as true, disregard proponents' evidence unless it aids contestants, and give contestants the benefit of every favorable inference which may be drawn from the whole evidence. Wilhoit v. Fite, 341 S.W.2d 806, 813 [4] (Mo. 1960); Switzer v. Switzer, 373 S.W.2d 930, 938 [11] (Mo.1964); Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135 [7] (1941).

Some of the background facts, as disclosed by this record, are pertinent to the decision of this appeal.

Martha Salladay, the testatrix, was born in Sullivan County, Missouri on August 12, 1891 and died at Unionville, Putnam County, Missouri on January 29, 1971, at the age of 79 years. She had been married twice but at the period of time here involved was a widow, her second husband having died sometime before. She had no living children or direct descendants. She had operated a Gambles Store in Unionville for a number of years and she and her husbands had accumulated considerable farm and town properties and investments. After the death of Claude Salladay, her second husband, she continued to manage the properties and made home and personal loans. So far as this record discloses, she did all of her banking at the Farmers Bank of Unionville.

The nieces and nephews of Martha Salladay involved in this litigation were the children of a deceased brother and Martha Salladay had substantially contributed to their upbringing. Some or all of them had lived in her home from time to time and

1. The will notes that a farm had been deeded during testatrix's lifetime to respondent Basil Salisbury.

she was described by her niece LaVetta Bush as "like a mother" to all of them. At one time, Martha Salladay expressed a desire to legally adopt the respondent, Eldon Salisbury.

There was substantial and abundant evidence of frequent family reunions on holidays and birthdays; the exchange of birthday cards and Christmas presents; almost daily contact with her in person or by telephone by Basil Salisbury or his wife Mary; visits by various family members to her during her various hospitalizations; almost daily visits by Olive Alexander after Claude Salladay's death; and that Martha Salladay expressed her love for Mauretta Carder and Mary Salisbury.

Testimony was offered by the defendant that during the last few years of testatrix's life, she became "incensed" at her relatives because they did not visit her and disliked some of her relatives because "they did not come to see her". Defendants also offered proof that there were some difficulties between Martha Salladay and Basil and Mary Salisbury over an indebtedness and that, through defendant Atherton, she at one time filed a suit on a note against Olive Alexander and her husband. This attitude on the part of Martha Salladay in the last years of her life, even if believed by the jury, found ready explanation in the fact of her physical and mental condition during that period. We do not view such evidence to be of such weight or force as to require the court to direct a verdict for the defendants, upon either the facts or the law. Neither do we consider that such evidence, considered with all the other facts in the record, constitutes sufficient justification for the testatrix to exclude from her bounty the natural objects thereof, in the absence of undue influence upon her to do so.

Henry Gardner was at all times pertinent herein the president, director and largest stockholder in the Farmers Bank of Unionville and stated by defendant Atherton, Gardner and the bank were "one and the same". In addition, he owned an abstract company and an insurance agency in Unionville. He had known the testatrix since 1920.

L. E. Atherton was a practicing attorney at Milan, Missouri and had known the testatrix since childhood. He had performed some legal services for her in the late 1920's or in 1930, but he did not represent her from 1930 until 1954. He performed many services for her from 1954 until her death, and he had drafted three wills for her which were executed, the last of which is the one here in question, executed on March 3, 1969, and admitted to probate in Putnam County on February 1, 1971. He had known Henry Gardner since 1923.

■ With these background facts, the basic and well-established decisional rule governing cases of "undue influence" in will contest cases should be stated. In such matters a presumption of undue influence arises when evidence is adduced showing, *one,* that a confidential or fiduciary relationship existed between the testatrix and the beneficiary; *two,* that the fiduciary has been given a substantial bequest by the will; and *three,* that the fiduciary was active in procuring the execution of the will. Simmons v. Inman, 471 S.W.2d 203, 206 [1] (Mo.1971).

■ Applying this basic rule (together with its corollary, the "most favorable evidence" rule) to the record before us, there can be no doubt that a fiduciary or confidential relationship existed between the testatrix, Martha Salladay, and the defendant, Henry Gardner, and, thus, the first element necessary to raise the presumption of undue influence was established. It should be noted that the term "fiduciary or confidential" is not here used solely in its strict, formal sense, but the terms are generally synonymous in this context and "a confidential relation exists between two persons, whether their relations be such as are technically fiduciary or merely informal, whenever one trusts in and relies on

the other", Wilhoit v. Fite, supra, l.c. 341 S.W.2d 813 [6].

There is substantial direct evidence that for a number of years Gardner had assisted and advised Martha Salladay with reference to her business affairs. Among other things, he received rental payments in her behalf; assisted in the collection of delinquent rents and in foreclosures; prepared deeds and "other papers" for her; he wrote checks on her account for the payment of bills and taxes, some of which she personally signed and others he signed as her agent, although he did not think that his name was on the signature card for her account; he kept her business records; he had access to her safe deposit box, in which at the time here involved she had $65,000–$70,000 in government bonds; he found buyers and sold a couple of her properties; he wrote her insurance through his insurance agency; he purchased a $5,000.00 certificate of deposit in his bank payable to testatrix or L. E. Atherton by means of a check drawn by him on the Salladay account; and, he conferred with her attorney Atherton about her business affairs and upon one occasion paid Atherton $650.00 by check drawn by him on the Salladay account to cover an attorney's fee earned in a foreclosure proceeding.

His attentions to Martha Salladay also included driving her "all over the country"; taking her "anyplace she wanted to go"; took her to her doctor's office on many occasions, to her farms, to Kirksville, Brookfield, Milan and Iowa City; tried to see her every day and took her on car rides every night in good weather; took her on boat rides; brought food to her home when she was ill; and, frequently accompanied her to visit her relatives (respondents) who lived in the area. In a letter to Mauretta Carder and in conversations with a niece by marriage, she referred to Gardner as "her boyfriend" and told the niece that Garnder had asked her to marry him. Gardner was at the hospital daily during the last illness of testatrix.

We can only conclude that for a number of years prior to the execution of the will in question, Henry Gardner occupied a confidential relationship with the testatrix.

Neither can there be any doubt that the will gave Henry Gardner a substantial bequest. By its terms, he was to receive 75% of the residue. The probate court inventory showed an estate value of $165,231.24. There were no specific bequests in the will and its value could only be depleted by taxes, payment of current bills, expenses of last illness, burial and the cost of administration and the payment of any claims. It is obvious that the Gardner bequest, without the recoupment of any assets which might be subject to such action, can be conservatively estimated as from $75,000.00 to $100,000.00.

In this connection, it should be noted that L. E. Atherton testified that he had seen a will of Martha Salladay drawn in 1965 or 1966 by someone else, which made no provision for Gardner. He had drawn a new will for her in early 1968 which made no provision for Gardner. In late 1968, he had drawn a will for Martha Salladay which left 25% of the residue to Gardner, but she had never executed the will, and she had destroyed it and all copies. He thereafter drew the will here in question, which was executed March 3, 1969.

The real critical issue before us is whether or not there was sufficient evidence to submit to the jury that Gardner was active in procuring the execution of the will in question. Before reviewing the facts in the record relative to this point, certain precedents are recognized.

■ The courts of Missouri have long judicially recognized the basic psychological fact that a person intent upon exerting undue influence in the execution of any aim, including gain by testamentary bequest, will do so in as subtle, furtive, indirect and elusive a manner as possible. As the court said in Wilhoit v. Fite, 341 S.W. 2d 806, 813 [2] (Mo.1960) [quoting from

the earlier case of Coldwell v. Coldwell, 228 S.W. 95, 102 (Mo.1921):

> " 'As a rule undue influence is not proclaimed from the housetop, but is hidden like a candle beneath a bushel and concealed like fraud and deception, only appearing through carelessness and unguarded openings. * * * ' "

Having thus recognized the inherent character of such activity, the courts inevitably and properly have held that undue influence in will contest cases need not be established by direct evidence. In other words, it may be shown indirectly by the reasonable and natural inferences drawn from the facts and circumstances proved, or in short, by circumstantial evidence. Welch v. Welch, 354 Mo. 654, 190 S.W.2d 936, 938 [1] (Mo.1945). In Switzer v. Switzer, 373 S.W.2d 930, 938 [9] (Mo. 1964), the court stated the principle as follows, l.c. 938:

> "The controverted issue is whether in addition to the existence of said fiduciary relationship and a greater benefaction to said beneficiaries there was evidence, *direct or inferential*, that said beneficiaries were active *in causing or assisted in causing* the execution of the will involved. Loehr v. Starke, 332 Mo. 131, 56 S.W.2d 772 [4, 6]; Buckner v. Tuggle, 356 Mo. 718, 203 S.W.2d 449 [1–3]; 7 Mo.L.R. 188. *'Such activity on the part of the fiduciary-beneficiary may be inferred from facts and circumstances in evidence.'* " (Emphasis supplied)

■■ Further exposition of this salutory rule is found in the decisions which hold that the person charged with the exercise of such undue influence need not necessarily be physically present at the time of the execution of the will, Hammonds v. Hammonds, 297 S.W.2d 391, 395 [5] (Mo.1957), or that it be directly shown that such influence was actually exerted at the exact moment of execution, Simmons v. Inman, 471 S.W.2d 203, 207

(Mo.1971), in order to be charged with the consequences of his other activities inducing its execution.

■ Although the contestants in the case before us did not submit its pleaded theory of the mental incompetency of Martha Salladay, it was entirely proper that proof of her physical and mental condition be placed before the jury for its consideration, not as to the incompetency of the testatrix, but as proof of her then *susceptibility* to the persuasion of undue influence. As the court said in Wilhoit v. Fite, supra, 341 S.W.2d at l.c. 813 [3]:

> " * * * And it is important and relevant *in determining questions concerning the existence of a confidential relationship and the exercise of undue influence* to consider the physical and mental condition of testatrix during the period in question. Snell v. Seek, 363 Mo. 225, 250 S.W.2d 336." (Emphasis supplied)

See also: Simmons v. Inman, supra, 471 S.W.2d at l.c. 206.

■ Other factors or circumstances bearing upon this problem are evidence of power to influence the testatrix and opportunity of Gardner to do so, Hammonds v. Hammonds, supra; Steller v. Steller, 401 S.W.2d 473 (Mo.1966); and whether the will makes an unnatural disposition of the estate and represents a sudden change from former wills, Simmons v. Inman, supra, 471 S.W.2d, l.c. 206–207.

The testatrix, Martha Salladay, suffered a stroke in 1961 which left her "crippled" and the record shows that her physical and mental condition thereafter steadily deteriorated. She had suffered from Parkinson's Disease since 1950, which was described by a medical witness as a disease of the central nervous system resulting in difficulty in speech, tremors, spastic body movements and an unsteady or "cogwheel" gait to prevent falling backwards. This witness also stated that senility was part of her illness. She had suffered from cataracts and had an eye removed in Kansas

City and suffered from impaired vision in her remaining eye. She had sustained a fractured right hip in 1967 or 1969. She suffered from a vascular disease and upon a number of occasions an upper respiratory tract infection. She suffered from some type of heart condition and nervousness and tremors of the hands, which made it difficult for her to write. From July 11, 1967 she was hospitalized on eleven (11) occasions for periods totaling approximately 227 days and culminating in her death in the hospital on January 29, 1971.

She was confused at times and had difficulty recognizing her relatives when visiting and would frequently mistake one for another. During such times she would speak of her husband as though he were alive and expected back from a trip or from the farm.

One of the really startling indications of her confusion and susceptibility to influence is that on April 26, 1968, by warranty deed, she conveyed a 340 acre farm in Sullivan County to her attorney L. E. Atherton, presumably for attorney's fees of approximately $4,000.00–$5,000.00 for past services. Atherton testified that he did not bill her regularly for his services but that at the time of her death she owed him not in excess of $8,750.00. Previously in January of 1968, a certificate of deposit in Farmers Bank had been purchased in the name of testatrix or L. E. Atherton in the amount of $5,000.00 to become due January, 1969. The testatrix wrote L. E. Atherton and his wife on January 18, 1968 that she had done this after "a long visit with Henry" (Gardner) and that Gardner thought it was "alright" (sic). Atherton had prepared the warranty deed and testified that Martha Salladay signed it in the street at Milan outside her automobile "so she wouldn't have to climb up on the walk."

Thus, in April of 1968, Atherton had claim of ownership to the 340 acre farm and was co-owner of a certificate of deposit in the Farmers Bank in the amount of $5,000.00.

Virgil Salisbury, respondent herein, testified that later Martha Salladay became very upset about the Sullivan County farm and, "Well, she told me that Henry Gardner took the papers to Milan on that farm to get Claude's name off of them, because it had my Uncle Claude Salladay's name on it, and she said, 'You know what they did?' She said 'They signed it over to Leman Atherton.' I said, 'I thought you was going to let Basil go down there and do that.' 'Well, Henry wouldn't let me, he wouldn't let me, he wouldn't listen to him (sic)' ". At a later date, probably June, 1968, when Martha Salladay was in the hospital Virgil testified that she said to him in reference to the deed, " 'You know Claude's name was still on that deed of the farm', and she said it had to be got off. And she said, 'Henry took it to Milan and signed—and signed it over to Leman Atherton to clear the deed to get Claude's name off from it and, you know, they didn't—he wouldn't sign it back'. And she was very broken in speech and she was hard to understand."

Doctor Ritter, her attending physician, in June, 1968, testified that Martha Salladay told him she thought she was signing a tax form; that she did not know she was signing her farm over to her attorney. When she found out she had signed a deed "it was necessary to sedate her to the extent that for about 48 hours she was out." He further testified that in the spring or early summer of 1970, when she was under his care in the hospital, after Mr. Atherton and Mr. Gardner came to visit her she became so agitated about the farm that she was again given sedatives.

Before her death, Atherton's name was removed from the certificate of deposit but the form was never deeded back to her nor was it listed as an asset of the estate. Atherton testified that he had filed a claim against the estate (of which he is executor) in the amount of $5460.00, the exact value of the certificate with accrued interest. He testified he sold the farm in January of 1972.

Atherton discussed Martha Salladay's business affairs with Gardner on numerous occasions, but both denied that they had ever discussed her will.

Further facts and circumstances in the record and worthy of consideration on the issue of undue influence, leading to the execution of the will, are these:

As above noted, Atherton testified that late in 1968 he had prepared a will in which Gardner was named as beneficiary for the first time to the extent of 25% of the residue. Martha Salladay had not executed this document. Atherton stated that Gardner brought the testatrix to his office on December 4, 1968. Gardner remained in the outer office while he conferred with his client. He claimed the will was not discussed at that time.

Under date of February 11, 1968, the testatrix wrote Mauretta Carder, "We are going to Milan tonight to see Leman", and Gardner testified that he did take her to Milan to Atherton's office that night and waited for her in the outer office and did not know the subject matter of the conference.

Atherton testified he again discussed the will with Martha Salladay at her home on February 16, 1969, and February 24, 1969. He drafted the will in question on February 25, 1969. He called Gardner on March 1, 1969, but he stated they only discussed a problem of rent.

The two previous wills drawn by Atherton and signed by Martha Salladay were executed in his law office at Milan. The will in question was executed in the board of directors room at the Farmers Bank at Unionville. The two witnesses were Ashley A. Williams and Melvin Sparks, both officers of the bank.

Williams testified that he was Vice President, Director and Cashier of Farmers Bank and had been connected with that institution thirty (30) years. He considered Henry Gardner his boss and close personal friend and he would like to help Gardner in any way he could. The will was executed on March 3, 1969 in the board room and Atherton (but not Gardner) was present. No one read or explained the will to Martha Salladay in his presence. He took it for granted that she knew what she was doing. He had never witnessed a will for Atherton before, nor has he since March 3, 1969.

Sparks testified that he was Assistant Cashier of the Farmers Bank and that the will was signed by Martha Salladay in the board room of the bank on March 3, 1969, after banking hours. Mrs. Salladay did not read the will and Atherton did not read it to her. Atherton took possession of the will after it was signed. He stated that Atherton had called Williams with reference to this matter but Atherton denied making any prior arrangements.

Gardner was not physically present at the signing of the will and testified that he did not see Martha Salladay at all on March 3, 1969. This would obviously constitute a departure from his usual routine attentions to her. It was further shown in the record that on March 3, 1969, he had made out two checks (Exhibits in the case) on her account and that Martha Salladay had signed them, one being payable to his own insurance agency. It would not stretch credulity for the jury to conclude that he did in fact see and talk to her on March 3, 1969.

Admittedly, this brief summary of the evidence favorable to the contestants does not constitute direct, "house-top" proof of undue influence of Gardner in the execution of the will, but it *would stretch* credulity (with the background of intimate, confidential business relations between testatrix and Gardner, professional and business relations with Atherton, the proven liaison between Gardner and Atherton concerning her business and property, her physical condition and her tenuous hold upon life) that Gardner knew nothing and had no concern with her intentions regarding the testamentary disposition of her property.

Although Atherton testified that Martha Salladay had expressly admonished him not to discuss her will with Gardner, he, Gardner, stated that she had told him she had left "75%" to him and he was interested enough and Atherton loquacious enough to confirm this fact.

These circumstances were alone sufficient for the jury to infer that Gardner and Atherton were engaged in some joint effort toward the execution of the will and a division of the bulk of her estate.

There are other facts in the record supportive of such an inference:

1. Two or three days before Martha Salladay's death, when she was "pretty near gone", Gardner obtained the title certificate to her Buick automobile from the safe deposit box and as he stated, at her request, had her transfer the title to Mary (Mrs. Basil Salisbury) by her "mark". After her death, he gave the title to Mary Salisbury.

2. Atherton conferred with Gardner after the death of Martha Salladay with reference to a possible claim by Mary and Basil Salisbury against the estate for their care and attention to Martha Salladay in the amount of $1,000.00. Atherton thought the estate "morally obligated" for this claim and Gardner agreed.

3. Gardner talked with Valee McKinley, who was the niece of Martha Salladay's first husband, David Bramhall, shortly after Martha Salladay's death. Gardner told her she should file a claim for $1,000.00 for services in the estate. Mrs. McKinley testified for the proponents.

4. Both Gardner and Atherton conferred with Basil and Mary Salisbury about filing a claim in the estate for services rendered to Martha Salladay. This suggestion would seem to present a conflict with the trial position of the proponents that Basil and Mary neglected their aunt, the testatrix.

While apparently neither Mrs. McKinley nor Basil and Mary Salisbury filed any claims against the estate, it is indeed an unusual (if not unique) experience to have an executor and the principal beneficiary under a will admit that they urged persons who might contest the will or be important witnesses in such a contest to file claims against the estate and at least tacitly agree to their allowance.

The rule as to sufficiency of evidence to present a jury issue is thus stated in Pasternak v. Mashak, 392 S.W.2d 631, 637 (Mo.App.1965):

"* * * our appellate courts have adopted a very liberal attitude regarding the quantum of evidence necessary to establish that the fiduciary was actively concerned in some way which caused or contributed to cause the execution of the will."

For the reasons above delineated, we hold that the contestants carried their burden of proof and that a presumption of undue influence by Gardner was in the case.

But the appellants strongly assert and argue that this presumption (if it ever existed) disappeared in the face of the positive and direct evidence of Atherton and Gardner negativing all the facts giving rise to it. While such a presumption is rebuttable, we do not concur in appellants' view. Speaking of this presumption in a will contest case the Supreme Court of Missouri, en banc, in Loehr v. Starke, 332 Mo. 131, 56 S.W.2d 772 (1932) said, l.c. 776:

"* * * The presumption under consideration is not a mere legal fiction or procedural rule. It rests on a substantial basis of fact or inference. The presumption and fact, or inference, go hand in hand and really are the same thing. Hence, the presumption, with its underlying facts or inferences, *once being in the case, never does or can disappear but raises an issue for the jury.* * * *" (Emphasis supplied)

Following Loehr v. Starke, see also, Simmons v. Inman, supra, 471 S.W.2d l.c.

206 [2]; Pasternak v. Mashak, 392 S.W.2d 631, 637 (Mo.1965); Pulitzer v. Chapman, 337 Mo. 298, 85 S.W.2d 400, 412 [11] (1935).

We have carefully read the testimony and reviewed the evidence and the briefs and authorities of appellants in this case and find nothing therein to alter our view that the jury was amply justified in finding that Gardner "caused or assisted in causing" the execution of the will involved, Switzer v. Switzer, supra; that it could, and apparently did, disbelieve the direct evidence of Atherton and Gardner in the area of undue influence, and that its verdict was properly supported by the evidence. The trial court, therefore, did not err in failing to sustain appellants' motion for a directed verdict.

The judgment is affirmed.

All concur.