**Ernest Horton BOLIN, Carl G. Bolin, Sven Amos Bolin and Stanley L. Morris, Plaintiffs-Respondents,**

**v.**

**Chester ANDERS, Defendant-Appellant,**

**Westport Bank and Edward L. Fitzgerald, Administrator Pendente Lite of the Estate of Carl A. Olson, Respondents.**

**No. KCD 28681.**

Missouri Court of Appeals, Kansas City District.

Oct. 31, 1977.

Motion for Rehearing Denied Dec. 5, 1977.

---

Richard A. Rubins, Dennis S. Schwartz, Joseph A. Cambiano, Rubins, Kase & Rubins, Inc., Kansas City, for defendant-appellant.

Thomas J. Conway, Stephen G. Scholl, Thomas J. McKernan, Popham, Popham, Conway, Sweeny & Fremont, David L. West, Blackwell Sanders Matheny Weary & Lombardi, Edward L. FitzGerald, Downey, Sullivan & FitzGerald, Kansas City, for plaintiffs-respondents.

Before PRITCHARD, P. J., SWOFFORD, C. J., and DIXON, J.

DIXON, Judge.

Defendant appeals from a judgment for plaintiffs in a four-count petition in equity framed on the theory that defendant had obtained title to real estate by unduly influencing a grantor in the execution of nine deeds. Count III was dismissed without prejudice. The remaining counts were: Count I, which requested the setting aside of the deeds in question, an injunction against conveying or transferring the property, and for reasonable value of rentals received by the defendant. Count II, in the alternative, requested judgment for the reasonable value of any of the real estate conveyed prior to suit. Count IV requested appointment of a receiver and attorney fees against the defendant.

On Count I, the trial court ordered eight of the nine deeds in question set aside and enjoined the defendant. Judgment for $9,450 for the reasonable value of rentals was entered. On Count II, the court gave a judgment for $14,000 for the value of the ninth parcel of land which had been conveyed prior to suit. On Count IV, the court appointed a receiver and entered judgment against the defendant for attorney fees in the amount of $16,112.51.

The variety of claims of error of the appellant may be categorized under four general headings: first, defect in parties plaintiff and improper joinder; second, a claim that evidence did not support the findings of the court; third, that the court erred in the application of the Dead Man's Statute as to certain evidence offered by the defendant; and, fourth, that the trial court judgment is in error in allowing plaintiff to recover attorney fees and in dismissing without prejudice plaintiffs' claim for punitive damages.

Because of the complexity of the issues raised as to the joinder and nonjoinder of parties and the unusual nature of the joinder of those not parties in the original proceeding, it will be helpful to set forth the relationships of the parties and the general background of the dispute.

Carl Olson, a single person who never married, is the grantor of the deeds in question. In the early 1930's Carl Olson emigrated from Sweden to the United States. He lived with his sister, Tekla Bolin, her husband, and their four children. The four children, Horton Bolin, Carl Bolin, Amos Bolin, and Helen Carver, through her guardian, are the plaintiffs in this suit.

Tekla's son, Amos, has no children and suffers from mental problems resulting from injuries sustained during World War II. Carl and his wife, Pearl Bolin, have no children. Horton Bolin has a son and a daughter. Helen has a daughter, Christie Tatum. In 1970, Helen was declared mentally incompetent and the Jackson County Public Administrator serves as her guardian.

In 1966, Olson and Tekla executed identical wills, each providing a residuary testamentary trust with income payable to the survivor for life and granting the survivor the right to invade 5% of the principal each year. At the death of the survivor, the trustee is to create one separate share for each of Tekla's children who receive only trust income of their respective share for life. Upon the death of each child of Tekla, the respective share of the trust estate is distributed outright to that child's descendants, or if none, to the descendants of Tekla Bolin. The trustee named in the wills as originally written was the Westport Bank.

Olson was a tinsmith or sheet metal worker by trade. He first met Chet Anders, the defendant, in the 1930's when Anders, as a young man, went to work for Olson. Eventually, Olson turned over the management of the sheet metal business to Anders. After World War II, Anders and Olson operated a bakery business, a tire supply company, and owned jointly some Kansas real estate not involved in this litigation.

In December, 1970, Olson suffered a stroke and, while a patient in the hospital on January 14, 1971, executed a general power of attorney to Anders. This power was prepared by an attorney named Rankin, as were all the deeds in question. The deeds are all dated in 1972 and 1973. On January 27, 1971, Rankin prepared a codicil to the Olson will. That codicil names Chester Anders as executor and trustee and Rankin as attorney for the estate. There were five or six witnesses to the codicil, but it has never been proved up in the Probate Court. The codicil reaffirms the balance of the Olson will.

As noted, the original petition was by the children of Tekla or their representatives and, thus, was a suit by the income beneficiaries under the trust established by Olson in his will. Neither the trustee, Westport Bank, nor the living contingent remaindermen were joined.

I.

Adverting first to the claim of evidentiary defect will permit the necessary statement of facts sufficient for the disposition of the appeal. The defendant's claims of error are in two points, but may be considered together. The first claim is that the evidence is insufficient to show activity of the defendant in procuring the deeds so as to permit the plaintiffs to claim a presumption of undue influence. The second claim is that neither substantial evidence nor the weight of the evidence support the findings of the court, further that the evidence was not clear, cogent, and convincing. Both these points require that the evidence favorable to the judgment and the reasonable inferences be considered.

This litigation concerns nine deeds conveying nine separate parcels of real estate from the sole title of Carl Olson to Carl Olson and defendant, Chester Anders, as joint tenants. At the time of Olson's death, eight of the parcels were in the names of Olson and Anders as joint tenants. The other parcel was sold by Olson and Anders before Olson's death. These transactions all took place *after* Olson suffered a severe stroke on December 15, 1970, and was hospitalized until January 24, 1971. He never recovered completely from the stroke which caused him to be mentally confused and physically feeble. The only medical witness called by either party testified in answer to

a hypothetical question outlining deceased's condition after his stroke and, from studying the medical records, that Olson would not have the mental capacity to handle his own affairs.

On January 14, 1971, while Olson was still confined to his bed in the hospital, he executed a power of attorney giving defendant complete control over all his property and affairs. Rankin drew this power and testified that he notarized it. He was unable to recall going to the hospital for the execution of the jurat.

On January 27, 1971, just three days after his release from the hospital, Olson executed a codicil changing the executor and attorney in his will. Defendant, who was present at the house when the codicil was signed, was named executor. Rankin, who drew the codicil, was named as attorney for the estate. No changes were made as to the beneficiaries.

From the time defendant was granted the power of attorney on January 14, 1971, until Olson's death in October, 1974, defendant was at Olson's house daily and had a key to Olson's home. Defendant was domineering while Olson was passive. Olson was afraid of defendant. There was evidence a lock was installed on the door to Olson's bedroom. Rankin had prepared requests for Olson to receive the 5% of principal he was entitled to request from the trustee under Tekla's trust.

The total trust payments made by the Tekla Bolin trust to Olson during his lifetime amounted to $68,841.09. After January 15, 1971, the amount paid out was $49,739.92. In 1972, Olson requested the Westport Bank to send anything relating to the trust directly to defendant. Thereafter, all trust checks were sent to the defendant. The Westport Bank trust department checks bearing defendant's endorsement total $48,105.77. Yet the record shows that only one of these checks amounting to $436.59 was actually deposited in the joint checking account of defendant and Olson at People's Bank.

Olson had a savings account with defendant and defendant's wife named as joint depositors at the Metropolitan Bank in the amount of $10,468.81. Withdrawals from this account totaled $10,450.00. All of these withdrawal slips were signed by defendant. There was also a certificate of deposit worth $15,513.00 issued May 13, 1970, by the Metropolitan Bank to Olson. This certificate was endorsed by defendant, using his power of attorney, and paid by the bank on May 5, 1973.

Olson had another savings account at the People's Bank. In 1973, defendant's name was added to the account and, subsequently, defendant withdrew approximately $5,700.00. At the time of Olson's death, there was only $150.00 left in the account.

The evidence reflects a transfer of $45,500.00 in notes from Olson to Olson and defendant as joint tenants or tenants in common and other notes which included defendant's wife as payee. All of these notes with the exception of one, the Tatum note, show on their face that they were signed after Olson had his stroke and executed the power of attorney to defendant. The Tatum note was executed while Olson was in the hospital, but the date of the execution of the joint tenancy does not show on the note.

Defendant and his wife signed Olson's name to numerous checks totaling thousands of dollars. Defendant's wife admitted that she wrote the name "Carl A. Olson" on the back of nine Westport Bank cashier checks made out to Olson. She also admitted signing Olson's name to at least twenty-two other checks. A handwriting expert testified regarding other Westport Bank trust checks that Olson's signature was not genuine. All of these checks bear the further endorsement of defendant.

The deeds in question were all executed in 1972 and 1973, the year preceding Olson's death. A letter, written by defendant's wife at his request, directed Rankin to prepare a joint tenancy deed. This letter was written within a week of the signing of the deed putting the home place in joint names. Defendant transported Olson to the attorney's office each time the deeds were exe-

cuted and was either physically present when the deeds were prepared and signed or was in the immediate vicinity. No other person witnessed the making of these deeds except defendant and Mr. Rankin, who had represented defendant in the past and has handled legal matters for defendant since Olson's death. Neither defendant, defendant's wife, nor anyone else, notified any of the plaintiffs that Olson was putting all of his property in joint tenancy with defendant. There was no consideration paid to Olson.

Defendant collected rents from the properties owned by Olson. The reasonable rental values of the eight properties were established by the testimony of a real estate expert, whose testimony was not rebutted by any witness called by the defendant. One parcel of land was sold prior to Olson's death with the purchasers executing notes in the amount of $12,000 payable to Olson, defendant, and defendant's wife.

■ This case is governed by equitable principles. Cancellation of deeds is an extraordinary function of equity, and the evidence to justify it must be clear, cogent, and convincing. *Davis v. Pitti,* 472 S.W.2d 382 (Mo.1971); *Steller v. Steller,* 401 S.W.2d 473 (Mo.1966). The scope of appellate review in court-tried civil cases is governed by Rule 73.01 which has been construed to mean that "the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, [or] unless it is against the weight of the evidence . . . ." In addition, appellate courts are admonished to exercise their power to set aside a judgment "on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo.banc 1976).

■ A presumption of undue influence arises where the evidence adduced shows a confidential or fiduciary relationship coupled with evidence of facts and circumstances showing undue influence. *Salisbury v. Gardner,* 515 S.W.2d 881 (Mo.App. 1974); *Davis v. Pitti,* 472 S.W.2d 382 (Mo.

1971); *Bohnsack v. Hanebrink,* Mo., 240 S.W.2d 903 (1951). In *Salisbury,* a case involving a will contest, facts held sufficient to support a presumption of undue influence were that a fiduciary or confidential relationship existed between the defendant and testatrix, the will gave defendant a substantial bequest, and the defendant was active in procuring the execution of the will. The *Davis* and *Bohnsack* courts found these and other factors sufficient to affirm the trial courts' judgments cancelling deeds on the grounds of undue influence.

■ A confidential relationship alone is not enough to raise the presumption of undue influence. There must also be facts or circumstances tending to show undue influence. *Bohnsack, supra.* Furthermore, it is not necessary to show that the defendant was present or was exerting his influence at the exact moment of execution. *Salisbury v. Gardner, supra; Godsy v. Godsy,* 504 S.W.2d 209 (Mo.App.1973); *Davis v. Pitti, supra.* What is required is proof of facts from which an inference can arise that the undue influence was an active factor in the transaction.

■ Other factors or circumstances bearing on the court's finding of undue influence are many. In the *Davis* case, the court found the grantor's mental and physical condition to be "highly material upon a consideration of the issue of undue influence." *Davis v. Pitti, supra,* at 387. Evidence of the physical and mental condition of the grantor is relevant to prove his "*susceptibility* to the persuasion of undue influence." *Salisbury v. Gardner, supra,* at 886.

Another consideration that the courts consider relevant in determining the presence of undue influence is an unnatural disposition of property. *Drake v. Greener,* 523 S.W.2d 601, 607 (Mo.App.1975); *Salisbury v. Gardner, supra.*

A factor found particularly important in the *Drake* case was the absence of consideration for the transfer of a deed. In *Drake,* the question before the court was whether the absence of consideration for the deed in

question coupled with undue influence in its procurement was enough to justify the lower court's cancellation of the deed. In affirming the trial court's ruling, the appellate court stated the general rule as follows:

"[M]ere absence of consideration is not sufficient to warrant relief by way of equitable cancellation of an executed contract .or deed in the absence of some additional circumstance creating an independent ground for granting cancellation, such as fraud or undue influence. But where a person has been induced to part with a thing of value *for little or no consideration*, equity will seize upon the slightest circumstance of fraud, duress, or mistake for the purpose of administering justice in the particular case." (Emphasis added). *Drake v. Greener, supra,* at 606.

Concealment of the existence of such transfers is yet another factor to consider. *Godsy v. Godsy, supra* ; *Bohnsack v. Hanebrink, supra.*

◼ Applying these principles to the evidence favorable to the judgment and the essence of defendant's claim of error that the evidence does not disclose defendant was active in procuring the deeds so as to benefit from a presumption of undue influence, it is apparent that no error appears. The trial court made specific and detailed findings of fact. After preliminary findings relating to the execution and proof of the wills of Tekla Bolin and Carl Olson and the conveyances in dispute, the court found that Olson was 78 at the time of his stroke in December of 1970, never completely recovered from the stroke which caused him to be mentally confused, forgetful, and physically feeble. The court found that Olson was controlled by the domineering will of Chester Anders and that the execution of the deeds resulted directly from the undue influence exercised by Anders. The court related the execution of the power of attorney, which the court described as "sweeping," and the circumstances of the execution of this power, execution of the forged endorsements by the defendant's wife, control over the funds received from the Tekla Bolin trust and other funds of Carl Olson appropriated by the defendant as well as the defendant's activity in procuring the services of Rankin, who had been the defendant's lawyer and continued to represent him after the execution of the deeds, the concealment of the execution of the deeds as supportive findings on the issue of undue influence.

The court further found that Anders was in complete control of Olson's daily affairs, his financial affairs, was in his house daily, collected rents and had caused Olson to be fearful of Anders, as well as a consideration of the transfer of the $45,000 worth of notes to the joint names of Olson and Anders as joint tenants. All these findings were related to the existence of a confidential relationship which defendant admits existed, as well as to the findings of the undue influence and its operative effect on the execution of the deeds. The court also found that the defendant was not related to the deceased by blood or marriage and was not the natural object of the bounty of Olson and further found that Olson had always indicated a desire to care for his incompetent niece, Helen Carter, and his disabled nephew, Amos Bolin. Further, that the execution of Olson's will and the execution of the codicil affirming it indicated a desire on his part that his estate should go to the life beneficiaries named in the will and ultimately to the descendants of the life beneficiaries. The trial court considered as significant the fact that the estate had been almost totally depleted of assets at the time of the death of Olson, thus thwarting his desire to care for the natural objects of his bounty, some of whom might be considered to have had special claims upon that bounty by reason of their disabilities. These findings are also supportive of the trial court's finding that the undue influence of Anders was active in the procurement of the deeds.

The defendant also argues that the court's findings and conclusions ignored the testimony of disinterested witnesses who were presented by defendant, the evidence

offered by the defendant as to the Westport Bank's Trust Committee Minutes which indicated that they had made a determination that Olson was capable of handling his financial affairs. In this phase of the defendant's argument, he is clearly arguing as his brief asserts that the court's findings and conclusions as to the existence of undue influence were against the weight of evidence and not supported by substantial evidence. *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976), is cited in support of the argument. Applying the rule of *Murphy v. Carron*, and considering this record, this court cannot say there was not substantial evidence to support the trial court's findings and in weighing the evidence, this court is far from a firm belief that the action of the trial court was wrong in finding the deeds were the result of the undue influence of the defendant. All of the elements of undue influence sufficient to justify the setting aside of these deeds are present in this case. The defendant admits the existence of a fiduciary relationship. The trial court, upon substantial evidence, found that the defendant exerted undue influence over Olson and was active in the procurement of the deeds.

Defendant cites *McCoy v. McCoy*, 360 Mo. 199, 227 S.W.2d 698 (1950). In *McCoy*, there was "*no evidence* . . . of participation . . . of the grantees in the execution of the deeds." (Emphasis added). *McCoy, supra,* at 706. Finding it unnecessary to their decision, the *McCoy* court did not resolve the question of whether or not there was a confidential relationship between grantor and grantees.

Also cited is *Metter v. Janssen*, 498 S.W.2d 581 (Mo.App.1973). There the court upheld the trial court's decision to grant a directed verdict in favor of defendant on the ground that plaintiffs had not made a submissible case of undue influence. In *Metter*, a confidential or fiduciary relationship was not established. The defendant was the nephew of the decedent, a natural disposition of decedent's property. The contestants called one witness, who was one of the plaintiffs. The case is inapposite.

## II.

Defendant claims that the trial court erred in failing to recognize a waiver of the Dead Man's Statute and, thus, the court erred in not permitting the defendant to testify. This contention is based upon a letter offered by the plaintiff which purported to be a letter written by the defendant Anders. That letter is the letter to Rankin directing the execution of one of the deeds in question and bears a handwritten signature purporting to be that of Chester Anders. At the time the letter was offered in evidence, Rankin was on the stand; and plaintiff's counsel asked him to identify the letter, which the attorney did, indicating that it had been in his file until the time his deposition was taken. The letter was, of course, addressed to that attorney. When the defendant's wife testified as a witness in the defendant's side of the case, the counsel for the plaintiff in his initial cross examination exacted from her the admission that she had written the letter purportedly written by her husband and that she had signed his name to it. Although the letter was purportedly written by Chester Anders, it was, in fact, a letter written by his wife.

The letter purports to relay to Rankin the directions of Olson as to the preparation of one of the deeds in question and purports to be a recital of statements made by Olson. The defendant's wife unequivocally testified that she wrote the entire letter and signed her husband's name to it. She was never asked on her direct or cross examination whether Carl Olson had made the statement to her or to her husband that is attributed to Olson in the letter. Her testimony is only that she wrote the letter at the direction of her husband.

Defendant argues that since the letter contains what purports to be a statement of the deceased Carl Olson that the offer by the plaintiff of the letter constitutes a waiver of the Dead Man's Statute. The argument is that plaintiff, by offering this letter as evidence of the defendant's activity in procuring the deeds constituted an

admission of the defendant and that having introduced that admission of the defendant, the defendant could not thereafter be denied the opportunity to testify.

What defendant misconceives is the nature of the bar of the statute. The statute does not exclude evidence; it is directed to the competency of certain witnesses. To assert that a waiver would occur under these circumstances would, in effect, bar the offer of any evidence concerning transactions by any witnesses at the risk of waiving the statute. Here, the witnesses who testified about the letter were plainly not barred by the statute and could have testified fully concerning the origin of the letter as, in fact, the defendant's wife did. In *Stephenson v. Stephenson*, 351 Mo. 8, 171 S.W.2d 565 (1943), a letter of the deceased, in which the plaintiff identified the handwriting of the deceased, was admitted in evidence. The court held that the plaintiff was competent to testify concerning the handwriting. The plaintiff's own letter responding to the deceased's letter and reciting facts which furnished the basis for plaintiff's claim of an express trust was offered in evidence after being identified by a witness not a party to the transaction. The court held that plaintiff's letter was likewise competent as evidence of the transaction and said, "The statute deals with the competency of the witness, and not with the admissibility of evidence." *Stephenson, supra*, at 568. The fact that the letter may have implied an admission of activity on the part of the defendant in the instant case does not render the defendant a competent witness. A party protected by the statute waives it by offering the testimony of deceased in a prior hearing or by seeking to obtain the testimony of the party who is barred by the statute, not by offering evidence by witnesses not within the statutory bar.

The entire question of waiver is an afterthought. The defendant did not claim that the statute had been waived at the time the offer was made. In *Tomlinson v. Ellison*, 104 Mo. 105, 16 S.W. 201 (1891), the court held the refusal of the offer was proper where the party making the offer failed to call the court's attention to the claim of waiver.

The defendant's only citation, *Martin v. Norton*, 497 S.W.2d 164 (Mo.1973), does not assist him on the issue of waiver. There the waiver was clear because the testimony of the deceased in a different case was read to the court upon the specific theory that it constituted declarations against interest of the deceased party.

Defendant also complains that his offer of the defendant's testimony as to the transactions with the deceased should have been permitted because the objection made by the plaintiff was insufficient. Counsel for the plaintiff had in opening statement and throughout the trial been careful to point out to the court that he did not wish to waive the protection of the Dead Man's Statute. When the defendant took the stand and testified in his own behalf, the record is replete with objections by plaintiff's counsel that they were objecting to any testimony by the defendant on the ground that conversations or transactions between the defendant and the deceased were covered by the Dead Man's Statute and that the defendant could not testify to any of those transactions. The court noted that the objection was valid. The court indicated that he would permit any questions which did not violate the Dead Man's Statute, and the examination of the defendant continued with counsel for the plaintiff requesting that the witness not answer until he had had an opportunity to make an objection. After some quarreling between counsel, counsel for the defendant agreed that the same objection could be made to each question. Plaintiff's counsel, in an excess of caution as to the possibility of waiver of the statute, refused the agreement and continued to object to each question put to the defendant on the ground initially stated of the Dead Man's Statute. After some sparring, defendant's counsel announced that he felt he had asked all the questions he could that would not conflict with the provisions of the statute and made an offer of proof in narrative form. The

court, before an objection was made, overruled the offer of proof because of the Dead Man's Statute, and, again, plaintiff's counsel, in an excess of caution reiterated an objection that the offer of proof was in violation of the Dead Man's Statute. How the plaintiff could have made any further or other objection is not apparent. The citation of the defendant on this point of *Birdsong v. Estate of Ladwig*, 314 S.W.2d 471 (Mo.App.1958), is not helpful because there the court was confronted with a situation where the witness was disqualified under both the so-called *"transaction"* portion of the statute and under the *"administration"* disqualification. The objection in *Birdsong* failed to specify the portion of the statute under which the objection was made, and under either objection, the witness could have testified to some facts. The objector stated he wanted his objection to "go along" but failed to restate it when the ground shifted. Here, the plaintiff clearly and unequivocally indicated to the court that he was relying upon the disqualification of the defendant under the *"transactions"* disqualification, and *Birdsong* is not in point.

### III.

The defendant asserts the trial court erred with respect to the parties to the suit. In that connection, appellant has briefed four separate points. To summarize, these points are: that the testamentary trustee, the Westport Bank, was the one party permitted to bring an action absent a showing the trustee was hostile, had an adverse interest or refused to act; that the contingent beneficiaries were indispensable parties under Rule 52.04; that the court erred in permitting the Westport Bank to intervene because the intervention was untimely; and the trial court erred in permitting the intervention of the Administrator Pendente Lite of Carl Olson on the grounds that it was not timely.

This entire procedural tangle can be quickly resolved. First, it is not clear that the trustee had any power to act as to the particular subject matter of this litiga-tion. Although there was some small amount of personal property to which the testamentary trust could attach, there was no interest of the decedent in the record title to this real estate which could have furnished a basis for the creation of a trust imposing upon the Westport Bank the obligation to act as trustee. This is not a situation where a trustee has become charged with the administration of a trust as to certain property and an action is commenced with respect to that property. The entire argument of the defendant is premised upon this language in the defendant's brief, "It is clear that in this matter the testamentary trustee named in the will of Carl Olson, had *legal title* to all the *trust property* immediately on the death of Carl Olson and had the duty to recover any properties which may belong to the trust." (Emphasis added). That simply is factually wrong. The trustee could succeed to no *legal title* of Carl Olson for all the evidence in this case shows that the legal title to the property here in question had been conveyed by Carl Olson during his lifetime. The thrust of this suit is to set aside the legal title conveyed by those deeds and revest the legal title in Carl Olson. The point is without merit.

As to the joinder of the remaindermen as parties to this litigation, the trust instrument and the record in this case demonstrate that there were both living remaindermen whose taking was contingent upon their survival of the life tenants and there was a possibility of the addition of further remaindermen who would be legally classed as unborn contingent remaindermen. The interests of both the living contingent remaindermen and the interests of the unborn contingent remaindermen depended entirely upon the success of the plaintiff's suit. If the suit failed in its purpose of setting aside the deeds from Carl Olson to the defendant and Carl Olson jointly, then there would be no possibility of any remainderman receiving anything from this particular real property. Thus, the interests of the life tenants are parallel and supportive of the interests of both the liv-

ing contingent remaindermen and the unborn contingent remaindermen. In such circumstances, the doctrine of virtual representation applies and the representation of these parties by the life tenants constitutes a sufficient answer to the defendant's claim that they were not made parties to this litigation. *Brown v. Bibb*, 356 Mo. 148, 201 S.W.2d 370, 374 (banc 1947).

The last two points made by the defendant complain of the action of the trial court in permitting the intervention of the Westport Bank as a party defendant and the intervention of the Administrator Pendente Lite as a party defendant. As to the Westport Bank, the defendant asserts that the intervention was not timely because the Bank was guilty of laches or was somehow estopped by its delay in entering the litigation.

■■■ The timeliness issue is determined in two analogous cases: *Matter of Estate of Anderson*, 544 S.W.2d 35 (Mo. App.1976), in which, after a jury verdict in a proceeding to discover assets, a joinder of the administrator was made; and, in *Grundel v. Bank of Craig*, 515 S.W.2d 177 (Mo. App.1974), where the court held that the defect of parties plaintiff was waived by failure on the part of defendant to ask for dismissal on the specific ground there was a defect of parties plaintiff. Defendant here asserts by his motion to dismiss he raised the issue of parties plaintiff, but under the present Rule 55.27, it is necessary not only that the motion to dismiss be filed, but that it specify a defect in parties plaintiff if that is the ground for dismissal. Here, defendant filed a motion to dismiss on the ground the petition failed to state a cause of action and did not complain in any fashion to the trial court about the defect in parties plaintiff until after the court had made his initial findings of fact and conclusions of law and before the entry of final judgment.[1]

■■■ It is argued the defendant was prejudiced because the Bank's testimony concerning the condition of Carl Olson

would have constituted admissions binding upon the plaintiffs. The latter of these two grounds is wholly without merit. The Trustee, if it were in fact a party, would have been a party only as to the quantum of legal title which a trustee possesses; and, even if the statements of the Bank were considered to be admissions, they could bind only the legal title and not the equitable title of the beneficiaries. A leading text writer has stated the rule that the power of the trustees to represent the beneficiary does not extend to declarations against interest nor to admissions. G. Bogert, Trusts & Trustees § 593 (2d ed. 1960). Significantly, cited as authority for the rule in that text is a Missouri case, *Eitelgeorge v. Mutual House Building Association*, 69 Mo. 52 (1878). Other authority is also cited by the text.

In any event, even if the bank's statements concerning the condition of Carl Olson were considered as admissions, they were before the trial court as well as all of the testimony of the bank officials who observed him, and the trial court was in a better position to determine the weight and value to be given to that evidence either as an admission or as direct evidence of the condition of Carl Olson. This court does not have a firm belief that the judgment of the trial court was wrong on the finding of undue influence, and the point is denied.

■■■ The second point with respect to the joinder issue is the defendant's claim that the intervention of the administrator pendente lite was untimely and that the administrator did not make the required showing of an impaired or impeded interest to justify the intervention. The burden of the defendant's complaint is that the administrator has no proper function in the proceeding because he has no interest in real property or rent sufficient to justify his presence in the suit as a party. It is a sufficient answer to this argument to point out that the judgment for $12,000 for the property converted from real estate to personalty is directed by the court decree to be

1. *Kingsley v. Burack*, 536 S.W.2d 7 (Mo.banc 1976), cited by defendant is factually inappo-

site; there the verified motion to dismiss *specifically* raised the lack of necessary parties.

paid to the administrator and that, clearly, under Section 473.263 RSMo 1969, the administrator is obligated to take possession of personal property belonging to the decedent which would include the funds derived from the conversion of the real estate. So, too, to the extent that the rent constituted rent due at the death of the decedent, it would be personal property of the decedent and payable to the estate of the decedent. *Wocet v. Seacat*, 212 S.W.2d 449 (Mo.App. 1948). Both the bank and the administrator were made parties under pleadings by which they agreed to be bound by the judgment of the trial court. The trial court properly proceeded to judgment against all of the parties for the salutary purpose of eliminating unnecessary litigation. The statutes relating to intervention are broadly remedial and are intended to facilitate the determination of all related disputes in one proceeding and thereby avoid a multiplicity of actions. *State ex rel. Hughes v. Smith*, 485 S.W.2d 646 (Mo.App.1972). The defendant is not prejudiced, for, by this judgment, he is protected from any further litigation by the contingent remaindermen, born or unborn, the trustee, the administrator, or the life tenants. The intervention ordered by the trial court thus benefited the defendant by removing any exposure he might have had to multiple litigation.[2]

### IV.

■ The defendant asserts that the trial court erred in two further aspects with respect to the decree as entered. He further claims error with respect to the trial court's dismissal without prejudice of the claim for punitive damages. This claim of error may be of academic interest, but it has no practical reality in the framework of this litigation. The claim for punitive damages could only relate to the actions of the defendant with respect to the transactions specifically covered by the decree, the transfer of the nine properties upon which the suit was tried. Plaintiffs have a judgment with respect to that claim, and the

dismissal without prejudice of the claim for punitive damages is as a practical matter a final judgment with respect to punitive damages arising out of the actions relating to real property. The plaintiff may not hereafter litigate the issue of punitive damages concerning the activities of Anders with respect to the real property for that would clearly constitute a splitting of his cause of action.

■ The other and more significant claim of error by the defendant is the assertion that the trial court erred in allowing attorney fees to the plaintiff. In this, the defendant is correct. The general rule concerning the allowance of attorney fees is almost too well known to require citation. As it was stated in *Rook v. John F. Oliver Trucking Company*, 505 S.W.2d 157, 161 (Mo.App.1973), the rule is:

"Unlike the English courts, attorneys' fees in this state are ordinarily ' "recoverable only when called for by contract or provided by statute, or as an item of damage when their incurrence involves the wronged party in collateral litigation, or occasionally, when a court of equity finds it necessary to adjudge them in order to balance benefits." ' *Arnold v. Edelman*, 392 S.W.2d 231, 239 (Mo.1965), quoting from *Duncan v. Townsend*, 325 S.W.2d 67, 71 (Mo.App.1959); *Edwards v. Smith*, 322 S.W.2d 770, 777 (Mo.1959); *Watkins v. West*, 297 S.W.2d 568 (Mo. App.1957); 22 Am.Jur.2d, Damages, § 165."

■ The plaintiff seeks to justify the award of attorney fees on the ground that the acts of the plaintiff have created a fund from which others will benefit, and they are thereby entitled to attorney fees. The law, of course, provides for the allowance of attorney fees where a plaintiff has created a fund from which others will share. *German Evangelical St. Marcus Congregation of St. Louis v. Archambault*, 404 S.W.2d 705, 708 (Mo.1966). If the judgment in this case were personal to the defendants and the remaindermen so that it was ready for

---

2. *City of Bridgeton v. Norfolk & W. Ry. Co.*, 535 S.W.2d 99 (Mo.banc 1976), is factually dis-

tinguishable, for the intervention sought was *after* final judgment.

immediate distribution, the argument of the plaintiffs would have validity. The judgment of the court in this instance directs the payment of the money judgment to the estate of Carl Olson and, by the setting aside of the deeds, the legal title to the real estate not yet conveyed by Anders will vest in the trustee of the testamentary trust in the estate of Carl Olson. Neither these plaintiffs nor the contingent remaindermen will take any immediate benefit from this litigation. The plaintiffs may have a claim against the trustee for the creation of the funds which the trustee will receive. But, that issue is not in this case and need not be reached or decided here. In any event, Section 484.130 RSMo 1969 preserves a lien on the fund created, and the remand of this case will permit the attorneys to take appropriate action to enforce the lien.

Plaintiff seeks to justify the award of attorney fees by citing *Johnson v. Mercantile Trust Company National Association*, 510 S.W.2d 33 (Mo.1974). The cited case deals with the "collateral litigation" exception as to attorney fees and has no application here. No case is cited, nor can any be found where, in a case such as the instant case, attorney fees have been allowed.

The judgment of the trial court should be modified by deleting from the judgment the attorney fees and costs and, as modified, is in all other respects affirmed. The cause is remanded to the trial court with directions to amend its decree in accordance with the directions herein.

All concur.